[No. A114530. First Dist., Div. Two. July 17, 2007.]

In re JAMES R., a Person Coming Under the Juvenile Court Law.

[No. A115595. First Dist., Div. Two. July 17, 2007.]

THE PEOPLE, Plaintiff and Respondent, v.
JAMES R., Defendant and Appellant.

COUNSEL

Robert Navarro, under appointment by the Court of Appeal, for Defendant and Appellant.

Edmund G. Brown, Jr., Attorney General, Mary Jo Graves, Chief Assistant Attorney General, Gerald A. Engler, Sr., Assistant Attorney General, Martin S. Kaye and Jeffrey M. Bryant, Deputy Attorneys General, for Plaintiff and Respondent.

OPINION

**KLINE, P. J.—**

## INTRODUCTION

On this appeal, we determine that a juvenile placed out of home under the delinquency laws of this state has a fundamental constitutional right to visitation by family members and that the trial court unlawfully delegates its judicial power over visitation when it effectively delegates *all* decisions regarding family visits to the private program placement.

Appellant James R. was adjudged to be a ward of the juvenile court under Welfare and Institutions Code section 602, subdivision (a),[1] following his plea of no contest to allegations of continuous child sexual abuse (Pen. Code, § 288.5) and commission of a nonforcible lewd act (Pen. Code, § 288, subd. (a)). He was placed in the custody of the probation officer for out-of-home placement, and on January 18, 2006, he was re-placed at a residential sexual offender treatment program in Fair Oaks, California. He appeals from orders of the juvenile court emanating from the six-month review hearing (May 26 and June 23, 2006) and a 12-month permanency planning review hearing (October 17, 2006) denying his request that the court set mandatory minimum visitation between appellant and his father while he is in out-of-home placement. The program at which appellant is placed had limited his visitation with his father to once a month.

Appellant asserts on appeal that the juvenile court denied him his constitutional due process right to meaningful visitation when it refused to set mandatory minimum visitation with his father. He further argues that this failure constituted an unlawful delegation of judicial power and a failure to

---

[1] All statutory references are to the Welfare and Institutions Code, unless otherwise indicated.

provide reasonable services. Respondent counters that appellant has waived his constitutional challenge by failing to raise it in the trial court and that, in any event, the trial court did not abuse its discretion in allowing the residential treatment program to set the schedule for appellant's paternal visitation.

We shall conclude that at the permanency planning hearing, the juvenile court unlawfully delegated all determinations regarding family visitation to a private therapeutic program. In so doing, the court abused its discretion and violated the constitutional separation of powers.

## FACTS AND PROCEDURAL BACKGROUND

*Underlying Offenses*

On March 29, 2005, a report was filed involving nine-year-old Lauren R., a friend of appellant's stepsister Melissa S. During an October 2004 sleepover, while the adults watched a World Series game upstairs and appellant was babysitting the children downstairs, appellant sat next to Lauren as she lay on the couch to sleep. He began rubbing his hand on her thigh and kissing her. Lauren pushed him away, but he got behind her and pressed his body against hers. Appellant took her hand and made her touch his crotch area. Lauren locked herself in the bathroom.

On March 30, 2005, it was reported that appellant had sexually molested his stepsiblings, then nine-year-old Melissa and eight-year-old Ryan S., over a period of almost a year. Melissa reported that appellant "had been touching her on 'private places' for approximately a year." One time when he was babysitting Melissa and Ryan, he "tried to touch her breast and her vagina over her clothing." When Melissa pushed his hand away, he called her a " 'fucking bitch,' " before she left the room. According to Melissa, appellant "had continuously touched her inappropriately which included telling 'nasty stories,' making her and her brother [Ryan] touch his penis over his clothing, asking her to 'suck' his penis, rubbing his penis on her, and forcing her and her brother to touch his bare penis with their hands." Melissa could not recall details and dates of all the incidents except for two specific ones. "She also reported about 5-10 times when [appellant] would expose his penis and masturbate in front of her while watching sex scenes in a movie. [Melissa] stated [appellant] had attempted to touch her vagina about five times. Melissa said she did not tell anyone about the molestation because [appellant] had told her not to tell anyone about the incidents or they both would be in trouble."

Appellant admitted Melissa touched his exposed penis at his request. He also said he had taught Melissa and Ryan to " 'jack him off' " by touching his

exposed penis, and they had done so a minimum of 10 times. Appellant also admitted that on an unspecified number of occasions he would have Melissa or Ryan straddle his lap as he sat on the floor and the child not seated would count the number of pelvic thrusts of the stepsibling who was seated on appellant's lap. Ryan reported similar incidents, but was not able to relay the details. He, too, was told by appellant not to reveal the incidents or they would be in trouble. Appellant also reported incidents of mutual masturbation with Ryan. Appellant's six-year-old cousin Tyler (appellant's stepmother's nephew) also reported that appellant had touched him in his private area during a sleepover in October 2004. Tyler said appellant made Tyler touch appellant's genitals over the clothing and told Tyler not to tell anyone to avoid trouble. Tyler "reported one other similar incident in January 2005, but chose not to speak about it."

Appellant stated that he did what he did to the children as retaliatory acts against his stepmother because he was angry with her.

### The Wardship Adjudication and Disposition

**The petition.** On July 22, 2005, the People filed a delinquency petition (§ 602, subd. (a)), alleging that appellant had committed continuous child sexual abuse (Pen. Code, § 288.5; counts one through three), and a forcible lewd act upon a child (Pen. Code, § 288, subd. (b)(1); count four). At the time of the filing of the original petition, appellant was 16 years old and he was not detained in out-of-home custody. On November 21, 2005, count one was amended to add two additional victims and count five was added, alleging a nonforcible lewd act (Pen. Code, § 288, subd. (a)). Appellant pleaded no contest to counts one and five. Counts two through four were dismissed. The court sustained the petition as to count one as amended and count five and ordered appellant detained in juvenile hall, finding that continuance in the home was contrary to his welfare.

**Psychological reports.** Psychotherapist Arthur Paull prepared a psychosocial evaluation and risk assessment based upon four separate sessions with appellant. The report noted it was significant that appellant, after a period of "considerable shame" and reluctance, described the details of the offenses to him, as he had previously to his father and to the police. Appellant "clearly recognized that his behavior with these four children was wrong" and appeared "committed to the goal of not repeating the behavior." Appellant had no previous contact with law enforcement. Appellant also informed the psychotherapist that at age 11 or 12 he was molested by the father of one of his friends, who was also a neighbor. There were several incidents that included skin-to-skin contact with genitals. At the time of the evaluation, the identity of the neighbor was unknown.

The evaluation noted that appellant's parents are divorced. Appellant had major difficulties after the divorce. His schoolwork suffered. Appellant's father had remarried and the stepsister and stepbrother victims were the children of his new wife, Deena P. Appellant described ongoing conflict with his stepmother. Appellant described his father as "sometimes mean" when around Deena P. After his arrest, appellant moved to live with his mother in order to not have contact with the stepsiblings. Appellant expressed positive feelings about his biological mother. He continued to see his father on a daily basis through contact at his sports activities, which appellant enjoyed and in which he actively participated.

The psychotherapist recommended that, if found to have committed the offenses, appellant be placed in a community setting under strict conditions of probation. The recommendation was based on appellant's admission of the offenses, his expressions of remorse and a desire to not reoffend, and "the availability and presence of two positive care givers," his assessment as having a "low to moderate risk of committing another sexual offense," a lack of other severe behavioral or criminal problems, and his having a stable home and school environment, and the availability of good community based adolescent sex offender treatment in the county.

Appellant was also assessed by marriage and family therapist Larry Stone, who met with appellant nine times between April 28 and August 30, 2005. Stone reported appellant was "somewhat depressed." According to Stone, appellant did "not appear to show any evidence of sexual fixation, but is in considerable emotional distress due to his family situation. [¶] His sense of alienation from his stepmother and strong belief that his father never takes his side or stands up for him, has left him feeling alone and isolated. He is afraid to tell his father anything about how he feels, and apparently expects only a negative response if he does attempt to communicate with him." Appellant was unwilling to talk to his father about his feelings, but agreed to Stone talking to the father, with appellant not in the room. This suggested "a serious lack of trust in his father's reactions, and a great deal of emotional pain about them." Stone opined that appellant was "acting out his hurt and isolation in the family, and that what he did was most likely a cry for help. The fact that his stepmother's children were involved might also suggest it was his way of expressing the hurt and anger he was feeling in the family." Stone related that there were "still serious issues with his father, and much hurt about feeling rejected by him," but that Stone had been unsuccessful in getting appellant's father to schedule a therapy session where he could be included. Stone opined that full involvement by appellant's father in family therapy with appellant "is essential in order for [appellant] to have a successful outcome." Stone did not see appellant as being a serious danger to the community, but believed it

would be helpful for appellant to go through a teenage offender program and ongoing personal and family therapy, primarily with the participation of his father.

***Adjudication and disposition.*** On December 16, 2005, the court adjudged appellant to be a ward of the court and placed him in the custody of the probation officer for out-of-home placement. The court imposed conditions, including no contact with the victims, and no contact with children under the age of 14 without adult supervision approved by the probation officer. The court ordered a family visit at juvenile hall to occur on that day. No other provision regarding visitation was made by the court. The court set a five-and-one-half-month placement review hearing for May 2006. (See § 727.2, subd. (c); Cal. Rules of Court, rule 5.810(a).)[2]

On January 18, 2006, appellant was placed at Breaking the Cycle residential sexual offender treatment program in Fair Oaks.

*Six-month Review and Request for More Frequent Visitation*

***Probation report/case plan.*** At the May 26, 2006 review hearing, the court received and reviewed the report and recommendation of the probation department. The report recommended a permanent plan of "return home," and recommended that the court find that the extent of progress made by appellant, his mother and his father "toward alleviating or mitigating the causes necessitating placement has been: fair." The report identified the "likely date" for return home to be January 18, 2008, and that the department had made reasonable efforts to enable appellant's safe return home and that the "services set forth in the case plan [also included] those needed to assist the minor in making the transition from foster care to independent living."

As to appellant's "progress in placement," the report related: "The program reports that the minor continues to struggle with the rules and policies of the program. On May 22, 2006, this deputy spoke to a program staff and was told that [appellant] presents himself as a 'sneaky boy' and at times is non-responsive to treatment. The program reported the most recent incident that occurred the week of May 15, 2006. The minor was a member of a group from the program attending a[n] independent living skills class when he deliberately acted out and disrupted the class causing the other students to miss information from the instructor. [¶] This deputy met with the minor on April 11, 2006. The minor appeared to be in good health and did not complain of any medical problems. The minor has regular phone contact with his father; his family appears to be supportive of the goals and expectations

---

[2] All references to rules are to the California Rules of Court, unless otherwise indicated.

of the program. [¶] The minor attends school and is performing well; the school staff has not reported negative behavior."

The assessment, attached to the report, assessed the strengths of the minor and his family in a checklist fashion as: "appropriate housing; *available family to work with probation; commitment to making positive changes;* community involvement; employment/financial stability; *extended family available;* health insurance; minor acknowledges/understands problems/issues; *parent acknowledges/understands problems/issues; parental supervision/support; strong emotional bonds; supportive relatives or friends;* transportation; willing to participate in counseling/programs." (Italics added.) In assessing the needs of appellant and his family, the "supporting information" narrative stated: "Anger, resentment, and isolation seemed to be an issue affecting the minor's emotional well being. Family counseling should occur simultaneously to ensure rehabilitation. The minor appeared to be emotionally alienated from both sides of his family. Academics must be emphasized and the minor needs tutoring."

In the section regarding "[p]replacement services that will reduce or eliminate the need for placement and/or return the minor safely home," various types of counseling, including mental health, anger management and family counseling were checked. However "[f]amily conferencing/regular visitation" *was not checked.* The "supporting information" narrative stated: "Minor needs to be in a structured environment to identify and address any emotional issues. Behavioral modification programs combined with sex offender treatment program, individual and family counseling will increase the success rate exponentially." "Home on Probation" was checked as the updated case plan goal and a concurrent alternative goal, should efforts to reunify fail, was listed as "[a]nother planned permanent living arrangement." The case plan checklist assessment of the minor's needs, identified, among other things, the need for individual counseling, sex offender counseling, family counseling and "[m]*aintain close proximity to family.*" (Italics added.) The "Placement" section of the plan stated that the type of placement will be selected based on the following: "Consideration of the minor's need for the least restrictive, most family like environment; the minor's age, sex and cultural background; *the planned parent/guardian contacts during the separation* and the specific actions to be taken by the parent/guardian/minor which will facilitate reunification . . . . The placement selection will be a safe setting that is the closest proximity to the parent/guardian's home, consistent with the minor's needs and best interests." (Italics added.)

Among the responsibilities of the probation officer listed in the case plan service objectives section of the report, was a checked box for *"Monthly visits with the minor's parent(s) or guardian(s)."* (Italics added.) Among the

responsibilities tasked to appellant was resolving issues of "family conflict." Appellant's mother and father were each tasked with responsibility to "[c]onsistently, appropriately and adequately parent your child" and to "resolve issues of family conflict/instability." The projected completion dates for these responsibilities were stated to be "ongoing."

*Request for minimum visitation order.* At the May 26, 2006 five-and-one-half-month status review hearing, appellant's counsel advised the court that the program was permitting visitation only once per month and only one 10-minute phone call in and one out per week.[3] Specifically, counsel advised the court that appellant was afforded visitation with his father only once a month, despite his father's willingness to participate in visitation and his father's concern that this was appellant's first time away from home and that the father was his primary support. Counsel requested that "the Court order visitation a minimum of twice a month and that the Court authorize phone contact more frequently than once a week for ten minutes." The court expressed its reluctance to set minimum visitation, stating, "I can't really—I don't see how I can tell the program what they need to do." Counsel argued that other children in the program were able to see their parents twice a month as a reward for good behavior and that, although the program could allow passes for good behavior, it should not prevent parents willing to travel the distance to see their children from visiting twice a month, particularly as reunification was the goal for appellant. The court then stated it wanted to hear in writing from the program as to why they were not allowing greater contact. Therefore, the court ordered all prior orders to remain in effect, but deferred finding on the probation department's "reasonable efforts" until it received information from the program regarding phone contact and visitation.

*Program response.* On June 9, 2006, the executive director of Breaking the Cycle treatment programs addressed the court's query in writing. The letter states in relevant part: "It has been a policy since our doors opened, 10 years now, to be very cautious about the visitation of family and friends. Our young men come to us with various secrets, most times with more victims. It usually isn't until a juvenile sex offender feels safe in his environment, feels

---

[3] Counsel also expressed concern about the delay in beginning family therapy, advising the court that despite reports by two mental health experts stressing the importance of family involvement in this case and of the importance of family therapy, the first family therapy session had begun only a week before. Counsel also advised the court that appellant's mother had not contacted probation and that probation had advised the program not to permit contact between appellant and the mother—including denial of a phone call on Mother's Day and refusal to allow appellant to send her a card. The court indicated it was concerned about denying appellant and the mother phone calls and the probation department representative stated he would "look into it with the program." The record reveals no further information about this.

surrounded by rules and structure, and feels the confrontation by the treatment team and peers that the juvenile allows himself to open up and divulge information he had been suppressing. [¶] Often this information is about the victimization of other family members; sometimes the parents have known about this and have hid the information, and sometimes they don't know. Until the offender has 'bought into' the values and goals of the program, the agency believes that the offender is not safe to be out of the treatment team[']s influence and control. It is sometimes several months before the offender admits to additional victims. A victim being in the presence of his/her offender is traumatizing. The victim has been traumatized enough. [¶] We also find several of our juveniles have been victimized by family members and the child has protected the adult, so it is very risky to allow for unsupervised visits; at least until we have explored the situation more closely. Sometimes this process just takes time, time to get to know the offender and know the family. [¶] Our third reason for our cautious policy with visits, is that sometimes it is difficult for the offender to settle in, to believe that he is in a group home and he does have to follow rules, that the rules he will follow, will be that of Breaking the Cycle. Some offenders fight total structure and regulations, and when they see family, they attempt, desperately to manipulate and fight the system; which makes it more difficult when the family leaves. It sets the offender back in his program. [¶] It is pointed out in several journals, that at different times during their treatment, juveniles may require different levels of supervision and treatment intensity. It is stressed that to be most effective, the components of the continuum should have consistent treatment philosophies and approaches and, whenever possible, should provide stability in treatment providers. And, much of the literature argues that adequate family support can help reduce recidivism and, that it takes some time to distinguish if that parent is adequate. [¶] Next, it is important to point out that [appellant] has been disclosing other victims, 2 separate times, and we don't know if this is the end of it. At this point in his program, he is considered very high risk. [Appellant] has great difficulty in opening up and talking about issues, so we are moving forward with caution. [¶] Within our system, we allow for more visits when the offender works more diligently in the program and up in the level scheme. We have four levels, all are quite attainable, the young man just has to be motivated to get healthy. [¶] So, in closing, we do have a 'cautious' policy when it comes to visitation, but we do involve family, we are just vigilant. Our treatment team here at Breaking the Cycle try to stay educated in this field to give the juvenile the best treatment that can be obtained."

In forwarding the letter, the probation department also forwarded copies of the suspected child abuse forms related to two friends of appellant's stepsister that he had disclosed as victims and further advised that appellant had disclosed another family member victim and that a suspected child abuse

form would be forthcoming. The probation department stated "the need for caution and diligence is due to the fact that the minor continues to disclose family members as his victims of sexual abuse."

***Court's ruling.*** At the June 23, 2006 continuation of the five-and-one-half-month review hearing, counsel for appellant reiterated that appellant was not asking for off-site visits, for unsupervised visits, or for visits with any of his stepsiblings. Rather counsel requested "that the Court set a mandatory minimum visitation schedule" for visits with appellant's father. Counsel argued that the program's letter responded in generalities about issues involving treatment of juvenile sex offenders, but argued that there was "no evidence that any of those apply in this particular case." Counsel urged that appellant's disclosure of new victims evidenced that he was "invested enough in the program." Counsel urged that in the absence of authority in the delinquency area, the court should take guidance from juvenile dependency cases involving visitation that recognized regular and frequent visitation, consistent with the well-being of the child, was a prerequisite to reunification. Counsel also argued that in line with the dependency cases, it was inappropriate for the court to delegate that authority to the placement program or to probation.

The court observed that "right now there is one visit a month. So you're saying I should set it at a different level?" Counsel responded, "Well, the program is setting it because he's . . . minimally compliant." Counsel urged that in the dependency scheme two visits per month was usual and that in this case visitation "should be at least twice a month" in order to accomplish reunification—the goal for appellant. Counsel also pointed out that the parents can make little progress toward reuniting with the child without participating in visitation. Counsel advised the court that appellant's father was willing to comply with counseling, willing to be interviewed at length and willing to take a polygraph if required.

Counsel made it clear that appellant was seeking both "increased telephone contact and . . . minimum twice-a-month visits." The probation department representative stated, "In general, I don't have an objection to having minors visit their parents regularly. It's important if there's going to be reunification. However, in this case we don't know whether or not reunification is going to be a possibility or not." However, he urged the court to defer to the experts running the program.

The court then stated: "Okay. I'm not going to alter the program's process. They have provided a thorough letter about their policy. They have reasons for what they're doing with regard to the minor, especially since he has disclosed two new victims in the meantime. And they are providing visitation, and they are prepared to provide more when the time is right. But as

they say, their philosophy is to proceed cautiously. [¶] This isn't a standard dependency case. It's a delinquency. Not only that, it's a sex offender matter, and so there are different policies involved in that. [¶] So I am not going to alter it. It seems that the program is proceeding appropriately, and so I'll leave it where it is."

The court found that reasonable services had been provided, continued appellant in his placement, and set the matter for a review on October 17, 2006. Appellant filed a timely appeal (No. A114530) from the order issuing from the June 23, 2006 status review hearing, challenging the court's reasonable services finding and the failure to make a visitation order.

*October 17, 2006 Permanency Planning Hearing and Status Review*

A permanency planning hearing was held October 17, 2006. The probation department's permanency planning hearing report recommended that the court find that the extent of the mother's and father's progress toward alleviating or mitigating the causes necessitating placement had been "fair," and appellant's progress toward alleviating or mitigating the causes necessitating placement had been "good." It identified the permanent plan of "return home" and the likely date by which this goal would be achieved as December 22, 2007. The report related that since the last report, "the minor's attitude and behavior have improved. The minor has begun to participate more in individual and group therapy. [¶] On September 25, 2006, this deputy met with the minor and therapist at the program. The therapist reported that [appellant] had disclosed more victims." The child abuse report and written statements by appellant were attached. The probation officer stated that he had found appellant "to be more committed to treatment in the last month." Also, appellant's father had informed the program that he was willing to resume family counseling. The probation officer had been "assured by the program that they are advocating for counseling to begin sooner rather than later." Appellant "attends school on a regular basis and appears to be doing well in his academic endeavors." The probation officer recommended that appellant remain in placement and that a postpermanency planning hearing be scheduled. A program treatment summary, dated September 2006, confirmed that appellant "continues to do well overall in program with only minimal point loss for behaviors not atypical for any adolescent." Appellant was "working solidly" in the second phase of the program and had "completed the necessary steps of disclosure, identification of contributing factors, and exploration of distortions in thinking that allowed him to act out sexually." Appellant was "working on integrating new skills on a daily basis that demonstrate a shift in values identification, and more mature decision making based on conscience driven behavior." The probation case plan attached to

the report appears to be virtually identical to that previously prepared, except that the projected completion date was advanced from January 18, 2008, to December 22, 2007.

At the hearing, appellant's counsel again requested the court to "set a mandatory minimum visitation" so that appellant's father could visit more than once a month. Counsel referred to section 727.3, subdivision (a)(3), as requiring the court at a permanency planning hearing to "specify the nature and frequency of visiting arrangements with the parents" or legal guardians. (see § 727.3, subd. (a)(3).) At that point, the court stated its belief "that the placement did not want to have more visits until he disclosed additional matters, which he's now done. So I'm assuming the placement is going to start additional visitation, now that that's occurred." The court asked the probation officer whether that was his understanding and the probation officer responded: "It is. I'll speak to Mr. Alice to make sure that happens or get an update as to if that will happen." The court and probation officer both acknowledged that the "program is advocating for counseling to begin sooner rather than later," and the court then stated: "I'm not going to mandate them how many visits it is because I believe visits are considered also a privilege, and there may be interference with their point system if I do that. But I do want the visits to start happening more frequently, now that he's complied with their request." In its minute order, the court adopted its previous findings and again found the probation department "has complied with the case plan by reasonable efforts to enable the minor's safe return home and to complete whatever steps are necessary to finalize the permanent placement of the minor." It found December 22, 2007, was the likely date by which the agency would finalize the permanent plan or achieve the planned permanent living arrangement goal.

Appellant filed a timely appeal (No. A115595) from the minute order issued at this review, challenging the court's reasonable services finding and its failure to make a visitation order.

On January 4, 2007, we consolidated the appeals.

## DISCUSSION

### I. Waiver

Respondent contends that appellant has waived or forfeited his due process challenge to the court's refusal to set a minimum schedule of visitation on the grounds that the claim is made for the first time on appeal. We disagree.

Appellant's counsel clearly objected at both review hearings below to the court's failure to set mandatory minimum visitation. Counsel argued, based

upon statutes and rules governing delinquency proceedings and cases in the dependency context, that the court was obligated to set mandatory minimum visitation under California law and that the court was precluded from delegating visitation to the complete discretion of the program. As support, counsel cited several cases, including *In re Julie M.* (1999) 69 Cal.App.4th 41 [81 Cal.Rptr.2d 354], which discusses visitation rights as "aris[ing] from the very 'fact of parenthood' and the constitutionally protected right ' "to marry, establish a home and bring up children," ' " and which viewed the question of delegation of visitation as one of constitutional separation of powers. (*Id.* at pp. 49–52.) Counsel also cited *In re Danielle W.* (1989) 207 Cal.App.3d 1227 [255 Cal.Rptr. 344], which addressed challenges to the court's limited delegation of control over visitation to the department of children's services as both issues involving the constitutional requirement of separation of powers and the denial of due process. (*Id.* at pp. 1233, 1235–1238.) Although *In re Danielle W.* found no violation of the separation of powers in a limited delegation, the court pointed out "that a visitation order granting the Department *complete* and *total discretion* to determine whether or not visitation occurs would be invalid." (*Id.* at p. 1237.) In arguing that delegating all authority over visitation to the therapist or program was unlawful, counsel below also cited *In re Jennifer G.* (1990) 221 Cal.App.3d 752 [270 Cal.Rptr. 326], which discusses the delegation of power to determine visitation in the context of due process, recognizing that "[p]arents have the right of visitation from the fact of parenthood" and that " '[t]he parental right to have children and to the custody of those children is included among the liberties protected by the due process clause. . . .' [Citation.]" (*Id.* at p. 756.)

Moreover, were we to conclude that appellant had forfeited his specific due process challenge to the court's refusal to set minimum mandatory visitation, we would nevertheless address the inextricably connected questions of whether the court abused its discretion in refusing to set mandatory minimum frequency of visitation and in delegating visitation to the program.

## II. Visitation

*Visitation Impacts a Fundamental Right—the Parent-child Relationship*

■ Respondent agrees that "the interest of a parent in the companionship, care, custody, and management of his children is a compelling one, ranked among the most basic of civil rights [citations] . . . ." (*In re B. G.* (1974) 11 Cal.3d 679, 688 [114 Cal.Rptr. 444, 523 P.2d 244]; see *Hoversten v. Superior Court* (1999) 74 Cal.App.4th 636, 641 [88 Cal.Rptr.2d 197] (*Hoversten*).) The United States Supreme Court has repeatedly recognized that the "Due Process Clause of the Fourteenth Amendment protects the fundamental right

of parents to make decisions concerning the care, custody, and control of their children." (*Troxel v. Granville* (2000) 530 U.S. 57, 66 [147 L.Ed.2d 49, 120 S.Ct. 2054].)

The fundamental nature of the right as it affects even an incarcerated parent's visitation was recognized in *Hoversten, supra*, 74 Cal.App.4th 636. There, the appellate court held that an incarcerated parent is entitled to a hearing to determine his right to legal custody and visitation of his minor children. (*Id.* at p. 638.) The court said: "Inmates retain the right of reasonable visitation with their children. (*In re Smith* (1980) 112 Cal.App.3d 956, 968–969 [169 Cal.Rptr. 564]; see also *In re Brittany S.* [(1993)] 17 Cal.App.4th 1399, 1402 [22 Cal.Rptr.2d 50].)" (*Hoversten*, at p. 640.) "As to visitation, '[t]he relationship between parent and child is so basic to the human equation as to be considered a fundamental right, and that relationship should be recognized and protected by all of society, no less jailers. [Citations.] Interference with that right should only be justified by some compelling necessity, i.e., a parent dangerously abusing a child. . . .' [Citation.] It is elemental that any order concerning child custody and visitation must comport with due process. [Citation.] [¶] '[C]hildren have strong emotional ties to even the "worst" of parents. [Citations.]' [Citation.] 'While "use a gun, go to prison" may well be an appropriate legal maxim, "go to prison, lose your child" is not. . . .' (*In re Brittany S., supra*, 17 Cal.App.4th 1399, 1402.) 'Visitation rights arise from the very "fact of parenthood" and the constitutionally protected right " 'to marry, establish a home and bring up children.' " [Citation.]' (*In re Julie M.[, supra,]* 69 Cal.App.4th 41, 49 [81 Cal.Rptr.2d 354].)" (*Hoversten*, at p. 641.)

Nor can it be doubted that the child's interest in the parent-child relationship is at least as important and as worthy of protection as the parent's interest.[4]

---

[4] At the same time, we recognize, as did the court in *In re Holly H.* (2002) 104 Cal.App.4th 1324 [128 Cal.Rptr.2d 907], that "[t]he principle that minors and adults are treated differently is of course deeply embedded in our legal system. 'The State's interest in the welfare of its young citizens justifies a variety of protective measures. Because he may not foresee the consequences of his decision, a minor may not make an enforceable bargain. He may not lawfully work or travel as he pleases, or even attend exhibitions of constitutionally protected adult motion pictures. . . . The State's interest in protecting a young person from harm justifies the imposition of restraints on his or her freedom even though comparable restraints on adults would be constitutionally impermissible.' (*Planned Parenthood of Central Missouri v. Danforth* (1976) 428 U.S. 52, 102 [49 L.Ed.2d 788, 96 S.Ct. 2831].) These sentiments were echoed by our Supreme Court when it held that '[b]y no means are the rights of juveniles coextensive with those of adults. [Citation.] Minors' rights are often legitimately curtailed when the restriction serves a state's interest in promoting the health and growth of children.' (*In re Scott K.* (1979) 24 Cal.3d 395, 401 [155 Cal.Rptr. 671, 595 P.2d 105].)" (*In re Holly H.*, at pp. 1334–1335, fn. omitted.)

*Delinquency Cases as Guides*

Absent pertinent case law in the delinquency context regarding the contours of the right to visitation, appellant urges that our analysis should be guided by cases in the dependency area. Respondent counters that dependency cases are of limited relevance in the delinquency context because "[o]ther fundamental considerations besides family unification are also at play in making any delinquency dispositional order (including when the court is periodically reviewing its ward's status in an out-of-home placement)." Although dependency law and delinquency law are clearly not identical,[5] the Legislature has expressly set forth the purposes of the juvenile court law with regard to both dependency and delinquency in a single section, in which it recognizes the importance of the preservation and strengthening of family relationships for both dependent and delinquent minors.

Section 202, subdivision (a), provides as follows: "The purpose of this chapter is to provide for the protection and safety of the public and each minor under the jurisdiction of the juvenile court *and to preserve and strengthen the minor's family ties whenever possible, removing the minor from the custody of his or her parents only when necessary for his or her welfare or for the safety and protection of the public.* When removal of a minor is determined by the juvenile court to be necessary, *reunification of the minor with his or her family shall be a primary objective. When the minor is removed from his or her own family, it is the purpose of this chapter to secure for the minor custody, care, and discipline as nearly as possible equivalent to that which should have been given by his or her parents. This chapter shall be liberally construed to carry out these purposes.*" (Italics added.)

■ Section 202 also refers to "family preservation and family reunification" as "appropriate goals" in the delinquency context where consistent with the best interests of the minor and the public (§ 202, subd. (b)),[6] and

---

[5] "The dependency statutes embody three [p]rimary goals for children adjudged dependents of the juvenile court: (1) To protect the child (§§ 202, 300.2, 361, subd. (c)(1), 361.2, subd. (a), 361.3, subd. (a)(8), 366.21, subd. (e), 16500); (2) to preserve the family and safeguard the parents' fundamental right to raise their child, as long as these can be accomplished with safety to the child (§§ 202, 300.2, 361.5, subd. (a)); and (3) to provide a stable, permanent home for the child in a timely manner. (§§ 366.26, 358.1, subd. (b), 396, 16131, 16501.1, subd. (f)(9).)" (*In re Santos Y.* (2001) 92 Cal.App.4th 1274, 1317 [112 Cal.Rptr.2d 692].)

[6] "Minors under the jurisdiction of the juvenile court who are in need of protective services shall receive care, treatment and guidance consistent with their best interest and the best interest of the public. Minors under the jurisdiction of the juvenile court as a consequence of delinquent conduct shall, in conformity with the interests of public safety and protection, receive care, treatment, and guidance that is consistent with their best interest, that holds them accountable for their behavior, and that is appropriate for their circumstances. This guidance may include punishment that is consistent with the rehabilitative objectives of this chapter. *If a*

recognizes the duty of a parent to support and maintain the minor, even during a period of removal (§ 202, subd. (c)).[7]

The statutory framework for juvenile delinquency law was considered recently by another division of this court in *In re Antoine D.* (2006) 137 Cal.App.4th 1314 [40 Cal.Rptr.3d 885].[8] In describing that statutory framework, the court first focused on "its purpose: '(1) to serve the "best interests" of the delinquent ward by providing care, treatment, and guidance to rehabilitate the ward and "enable him or her to be a law-abiding and productive member of his or her family and the community," and (2) to "provide for the protection and safety of the public . . . ." ' (*In re Charles G.* [(2004)] 115 Cal.App.4th [608,] 614–615 [9 Cal.Rptr.3d 503], quoting § 202, subds. (a), (b), & (d).)" (*In re Antoine D.*, at pp. 1321–1322.)

The *In re Antoine D.* court observed that the Legislature has provided the juvenile court many statutory tools to accomplish the law's stated purposes. "Under section 202, subdivision (b), for example, the court may order delinquent wards to 'receive care, treatment and guidance which is consistent with their best interest, that holds them accountable for their behavior, and that is appropriate for their circumstances.' (See also *In re Eddie M.* (2003) 31 Cal.4th 480, 507 [3 Cal.Rptr.3d 119, 73 P.3d 1115] [acknowledging the juvenile court's 'broad discretion to choose probation and/or various forms of custodial confinement in order to hold juveniles accountable for their behavior, and to protect the public'].)

---

*minor has been removed from the custody of his or her parents, family preservation and family reunification are appropriate goals for the juvenile court to consider when determining the disposition of a minor under the jurisdiction of the juvenile court as a consequence of delinquent conduct when those goals are consistent with his or her best interests and the best interests of the public.* When the minor is no longer a ward of the juvenile court, the guidance he or she received should enable him or her to be a law-abiding *and productive member of his or her family* and the community." (§ 202, subd. (b), italics added.)

[7] "It is also the purpose of this chapter to reaffirm that the duty of a parent to support and maintain a minor child continues, subject to the financial ability of the parent to pay, during any period in which the minor may be declared a ward of the court and removed from the custody of the parent." (§ 202, subd. (c).)

[8] In *In re Antoine D.*, the juvenile court had refused the minor's motion to modify his California Youth Authority (CYA) commitment, despite CYA's admission that it could not keep the bisexual minor safe, could not prevent his harassment and injury by staff and other wards based on his sexual orientation, and could not provide him an adequate education. The juvenile court refused modification on the grounds that vacating or modifying the juvenile ward's CYA commitment would extinguish juvenile court jurisdiction over him. The appellate court held that the juvenile court had abused its discretion in denying the modification because it would not have lost jurisdiction over the minor by granting the motion and that, in any event, loss of jurisdiction was an improper basis for denying the motion. (*In re Antoine D., supra*, 137 Cal.App.4th at pp. 1318–1320.)

■ "More specifically, section 727, subdivision (a), permits the court to make 'any and all reasonable orders for [a ward's] care, supervision, custody, conduct, maintenance, and support . . . *subject to further order of the court.*' (§ 727, subd. (a), italics added [by *Antoine D.* court].) . . . 'Section 726 explicitly acknowledges "the power of the court to retain jurisdiction over a minor and *to make appropriate orders pursuant to Section 727 for the period permitted by Section 607.*" ' (*In re Charles G., supra,* 115 Cal.App.4th at p. 615, quoting § 726.)" (*In re Antoine D., supra,* 137 Cal.App.4th at p. 1322.) "Considering this statutory framework as a whole in light of its stated legislative purpose, it is clear juvenile delinquency laws are designed to provide the juvenile court maximum flexibility to craft suitable orders aimed at rehabilitating the particular ward before it. [Citation.]" (*Id.* at p. 1323.)

This flexibility is not unique to delinquency law; it is a hallmark of juvenile court law in general and of dependency law as well. Indeed, section 727 has been termed "the delinquency analogue to section 362, subdivision (a)," which, in the dependency context, provides the juvenile court similar flexibility to craft reasonable orders for the care of the dependent child. (*In re Carmen M.* (2006) 141 Cal.App.4th 478, 489, fn. 8 [46 Cal.Rptr.3d 117].)

Other sections of the delinquency laws also illustrate the importance of the family connection in the care and rehabilitation of the minor. Section 727.1, subdivision (a), provides that "[w]hen the court orders the care, custody, and control of the minor to be under the supervision of the probation officer for foster care placement pursuant to subdivision (a) of Section 727, the decision regarding choice of placement shall be based upon selection of a safe setting that is the least restrictive or *most family like, and the most appropriate setting that is available and in close proximity to the parent's home,* consistent with the selection of the environment best suited to meet the minor's special needs and best interests. . . ." (Italics added.)

Section 727.2 specifically addresses reunification services or the establishment of an alternative permanent plan for delinquent youth. In relevant part it provides: "The purpose of this section is to provide a means to monitor the safety and well-being of every minor in foster care who has been declared a ward of the juvenile court pursuant to Section 601 or 602 and to ensure that everything reasonably possible is done to facilitate the safe and early return of the minor to his or her home or to establish an alternative permanent plan for the minor. [¶] (a) If the court orders the care, custody, and control of the minor to be under the supervision of the probation officer for placement pursuant to subdivision (a) of Section 727, the juvenile court shall order the probation department to ensure the provision of reunification services to

facilitate the safe return of the minor to his or her home or the permanent placement of the minor, and to address the needs of the minor while in foster care . . . ." (§ 727.2.)

At status reviews prior to the first permanency planning hearing, the court is required to make findings and orders determining the "continuing necessity for and appropriateness of the placement" (§ 727.2, subd. (e)(1)) and, among other things, the extent of the probation department's "reasonable efforts to safely return the minor to the minor's home or to complete whatever steps are necessary to finalize the permanent placement of the minor" (§ 727.2, subd. (e)(2)) and the "extent of progress" by both the minor and parent toward alleviating the causes necessitating placement in foster care (§ 727.2, subd. (e)(4)). Moreover, section 727.2, subdivision (e), also requires that "[t]he court shall make these determinations *on a case-by-case basis* and reference in its written findings the probation officer's report and any other evidence relied upon in reaching its decision." (Italics added.)

Section 727.3, requiring that a "permanency planning hearing shall be conducted within 12 months of the date the minor entered foster care" (*id.,* subd. (a)(1)), contains the same statement of purpose as section 727.2: "The purpose of this section is to provide a means to monitor the safety and well-being of every minor in foster care who has been declared a ward of the juvenile court pursuant to Section 601 or 602 and to ensure that everything reasonably possible is done to facilitate the safe and early return of the minor to his or her home or to establish an alternative permanent plan for the minor." Section 727.3, subdivision (a)(3) provides: "If the minor has a continuing involvement with his or her parents . . . , the parents . . . shall be involved in the planning for a permanent placement. *The court order placing the minor in a permanent placement shall include a specification of the nature and frequency of visiting arrangements with the parents* or legal guardians." (Italics added.) Rule 5.810 (b)(4) provides in this regard that "[t]he permanent plan order must include an order regarding the nature and frequency of visitation with the parents or guardians."

Section 727.3, subdivision (a)(4) provides: "At each permanency planning hearing, the court shall order a permanent plan for the minor, as described in subdivision (b). The court shall also make findings, as described in subdivision (e) of Section 727.2. In the case of a minor who has reached 16 years of age or older, the court shall, in addition, determine the services needed to assist the minor to make the transition from foster care to independent living. The court shall make all of these determinations *on a case-by-case basis* and make reference to the probation officer's report, the case plan, or other evidence relied upon in making its decisions." (Italics added.)

Section 727.3, subdivision (b)(1), provides: "At all permanency planning hearings, the court shall determine the permanent plan for the minor. The court shall order one of the following permanent plans, which are, in order of priority: [¶] (1) Return of the minor to physical custody of the parent or legal guardian. . . ."

Although public safety and the rehabilitation of the minor (presumed to serve the best interests of the delinquent minor) are the preeminent goals of the juvenile law relating to delinquent minors, it is also true that family reunification and the reintegration of the minor into his family are statutorily recognized to be important and complementary goals. We see no persuasive reason that dependency cases cannot provide an appropriate guide for analysis of the visitation issues raised here.

*Standard of Review*

■ As previously emphasized, the issue of visitation implicates fundamental constitutional rights. Those rights may be limited, but only on the basis of compelling interests, such as the protection and safety of the public, the rehabilitation of the delinquent minor, and the minor's "best interests" in receiving the type of care that would "enable him or her to be a law-abiding and productive member of his or her family and the community." (§ 202, subds. (a), (b) & (d); see *In re Antoine D., supra,* 137 Cal.App.4th at pp. 1321–1322; *In re Charles G., supra,* 115 Cal.App.4th at pp. 614–615.)

Respondent contends that in the dependency context, the cases analyze the issues under the deferential "abuse of discretion" standard. However, the cases respondent relies upon involve review of a juvenile court's placement decisions and commitment orders, such as *In re B. G., supra,* 11 Cal.3d 679, 699, and *In re Robert H.* (2002) 96 Cal.App.4th 1317, 1329–1330 [117 Cal.Rptr.2d 899]. The visitation cases cited by the parties analyze the issue in the first instance as one relating to the separation of powers—that is, whether the trial court has unlawfully delegated its power over visitation to some other agency, person or entity. (See, e.g., *In re Chantal S.* (1996) 13 Cal.4th 196, 213–214 [51 Cal.Rptr.2d 866, 913 P.2d 1075]; *In re Julie M., supra,* 69 Cal.App.4th 41, 43, 48–51; *In re Donnovan J.* (1997) 58 Cal.App.4th 1474, 1476–1478 [68 Cal.Rptr.2d 714]; *In re Christopher H.* (1996) 50 Cal.App.4th 1001, 1008–1011 [57 Cal.Rptr.2d 861]; *In re Moriah T.* (1994) 23 Cal.App.4th 1367, 1373–1377 [28 Cal.Rptr.2d 705]; *In re Jennifer G., supra,* 221 Cal.App.3d 752, 756–758; *In re Danielle W., supra,* 207 Cal.App.3d 1227, 1235–1237.) This is the issue we address. *In re Julie M.* did use abuse of discretion language in determining that an order giving the children discretion to decide whether their mother could visit with them "essentially delegated judicial power to the children—an abdication of governmental responsibility . . . ." (*In re Julie M.,* at pp. 48–49.) Whatever the language used, an

improper delegation of judicial power over visitation will necessarily be found to constitute an abuse of discretion.

*Limits on Delegation in Dependency Cases*

In the dependency context, it is recognized that "[v]isitation is a necessary and integral component of any reunification plan. [Citations.] 'An obvious prerequisite to family reunification is regular visits between the noncustodial parent or parents and the dependent children "as frequent[ly] as possible, consistent with the well-being of the minor." ' (*In re Julie M.*[, *supra*,] 69 Cal.App.4th [at pp.] 49–50 . . . .)" (*In re S.H.* (2003) 111 Cal.App.4th 310, 317 [3 Cal.Rptr.3d 465], fns. omitted.)[9]

■ Similarly, where, as here, the permanent plan envisions return of the delinquent minor to his home, adequate visitation is a "necessary and integral component" of that reunification. Respondent argues that the majority of dependency cases draw a clear distinction between delegation of the decision of *whether* visitation will occur (impermissible) and delegation of the responsibility over management of visitation, including the *frequency* of visitation (permissible). Although generally correct, this neat division does not fully describe the case law.

The Court of Appeal, in *In re S.H., supra*, 111 Cal.App.4th 310, described the competing considerations involved in the assessment of whether a particular visitation order constitutes an invalid delegation of judicial authority:

"It is the juvenile court's responsibility to ensure regular parent-child visitation occurs while at the same time providing for flexibility in response to the changing needs of the child and to dynamic family circumstances. (*In re Moriah T.*[, *supra*,] 23 Cal.App.4th [at pp.] 1374, 1376 . . . ['Visitation arrangements demand flexibility to maintain and improve the ties between a parent or guardian and child while, at the same time, protect the child's well-being.']; *In re Danielle W.*[, *supra*,] 207 Cal.App.3d [at pp.] 1234–1235 . . . .) To sustain this balance the child's social worker may be given responsibility to manage the actual details of the visits, including the

---

[9] In the dependency context, visitation is also a critical component in the constitutionality of the procedures used for termination of parental rights. "The Supreme Court has held the statutory procedures used for termination of parental rights satisfy due process requirements only because of the demanding requirements and multiple safeguards built into the dependency scheme at the early stages of the process. [Citations.] If a parent is denied those safeguards through no fault of her own, her due process rights are compromised." (*In re Hunter S.* (2006) 142 Cal.App.4th 1497, 1504, 1505 [48 Cal.Rptr.3d 823] [following *In re S.H., supra*, 111 Cal.App.4th 310, and holding that although order granting visitation " 'as can be arranged' . . . granted visitation in theory, none was permitted in reality"].)

power to determine the time, place and manner in which visits should occur. (E.g., *In re Jennifer G.*[, *supra,*] 221 Cal.App.3d [at p.] 757 . . . .) . . .

"Nonetheless, the power to decide whether any visitation occurs belongs to the court alone. (*In re Christopher H.*[, *supra,*] 50 Cal.App.4th [at pp.] 1008–1009 ['The juvenile court has the sole power to determine whether visitation will occur and may not delegate its power to grant or deny visitation to the [Department of Social Services].']; *In re Jennifer G., supra,* 221 Cal.App.3d at p. 757.) When the court abdicates its discretion in that regard and permits a third party, whether social worker, therapist[10] or the child, to determine whether any visitation will occur, the court violates the separation of powers doctrine. ([*In re*] *Julie M., supra,* 69 Cal.App.4th at p. 51 [order giving child the option to either consent or refuse visits with mother unconstitutionally abdicated court's discretion to determine whether visitation would occur to child who essentially held veto power to ensure there would be no visits].)[11] The discretion to determine whether any visitation occurs at all 'must remain with the court, not social workers and therapists, and certainly not with the children.' (*Ibid.*; see also *In re Christopher H.,* at p. 1009; *In re Jennifer G.,* at p. 757.)" (*In re S.H., supra,* 111 Cal.App.4th at pp. 317–318, italics & fns. omitted.)

In *In re S.H.,* the appellate court reversed a portion of the jurisdictional order where the order appeared to determine that mother had a right to visit, but in fact made visitation contingent upon the children's approval. The visitation order stated, " 'if the children refuse a visit, then they shall not be forced to have a visit.' " (*In re S.H., supra,* 111 Cal.App.4th at p. 318.) The appellate court agreed with the mother's claim that, as in *In re Julie M., supra,* 69 Cal.App.4th at pages 46, 49–51, "the order grants the child de facto veto power to ensure no visitation will occur absent the child's consent [citation]."

---

[10] The *In re S.H.* court noted that *In re Donnovan J., supra,* 58 Cal.App.4th 1474, 1477, had "reversed a visitation order that simply stated, 'Father has "no visitation rights without permission of minors' therapists" ' because it neither required the therapists to manage ordered visitation nor set any criteria (such as satisfactory progress) to inform the therapists when visitation was appropriate and gave them 'unlimited discretion to decide whether visitation is appropriate.' *A therapist, however, may be allowed the limited discretion to determine when court-ordered visitation should begin. (In re Chantal S.*[, *supra,*] 13 Cal.4th [at pp.] 203–204 [order vesting discretion in therapist of parent's choice to determine when parent had made 'satisfactory progress' so that ordered visitation could begin is proper].)" (*In re S.H., supra,* 111 Cal.App.4th at p. 318, fn. 10, italics added.)

[11] "Article III, section 3, of the California Constitution provides, 'The powers of state government are legislative, executive and judicial. Persons charged with the exercise of one power may not exercise either of the others except as permitted by this Constitution.' The entire judicial power of the state is vested in the constitutional courts. (Cal. Const., art. VI, § 1.) Under the separation of powers doctrine judicial powers may not be completely delegated to, or exercised by, either nonjudicial officers or private parties. (See *In re Danielle W., supra,* 207 Cal.App.3d at pp. 1235–1236.)" (*In re S.H., supra,* 111 Cal.App.4th at p. 318, fn. 11.)

(*In re S.H.*, at p. 318.) The court recognized that the order did "differ from that in *Julie M.* in that it affirmatively determines there is a right to visitation rather than making visitation entirely contingent on the child's consent." (*Ibid.*, fn. omitted.) The juvenile court also issued companion orders aimed at encouraging visitation by requiring counseling for the children and the mother and by directing the department to describe to the children the safeguards in place to reduce the children's fears of visiting with the mother. (*Id.* at pp. 318–319.) Despite these additional characteristics, the court concluded that "*by failing to mandate any minimum number of monitored visits per month or even to order that some visitation must occur each month, the court's abstract recognition of [the mother's] right to visitation is illusory, transforming the children's ability to refuse 'a visit' into the practical ability to forestall any visits at all.*" (*Id.* at p. 319, some italics added; accord, *In re Hunter S., supra*, 142 Cal.App.4th at p. 1505 [holding that although order granting visitation " 'as can be arranged' . . . granted visitation in theory, none was permitted in reality"].)

*In re S.H., supra*, 111 Cal.App.4th 310, recognized that the visitation order was similar to that upheld "in *In re Danielle W., supra*, 207 Cal.App.3d 1227, which granted visitation 'at the discretion' of both the Department and the children and provided that the juvenile court 'would not force the children' to visit if they did not want to visit. . . . [T]he *In re Danielle W.* court upheld the order, concluding that it merely required the Department to take into account the children's wishes in connection with the visitation and in no way vested the children with the power 'to do more than express their desires in th[at] regard.' ([*In re Danielle W.,*] at p. 1237.)" (*In re S.H.*, at p. 318, fn. 12.) *In re S.H.* noted that it shared the "serious reservations" expressed by the *In re Danielle W.* court "about visitation orders that fail to provide the Department with guidelines as to the prerequisites of visitation or any limitations or required circumstances. [Citation.]" (*In re S.H.*, at p. 318, fn. 12, citing *In re Danielle W.*, at p. 1237.)

Nevertheless, *In re S.H.* expressly stated that it was "not suggesting either that the juvenile court must always specify the frequency or length of visits (compare *In re Jennifer G., supra*, 221 Cal.App.3d at p. 757 [court should 'determine whether there should be any right to visitation and, if so, the frequency and length of visitation'] with *In re Christopher H., supra*, 50 Cal.App.4th at p. 1009 [rejecting such a requirement] and *In re Moriah T., supra*, 23 Cal.App.4th at p. 1376 [same]) or that the court may not direct that the child's wishes with respect to the timing, length or location of visits be considered (see *In re Nicholas B.* (2001) 88 Cal.App.4th 1126, 1138–1139 [106 Cal.Rptr.2d 465]; *In re Danielle W., supra*, 207 Cal.App.3d at p. 1237). Indeed, the Department and mental health professionals working with it and with the dependent child may determine when visitation should first occur. (See *In re Chantal S.*[, *supra*,] 13 Cal.4th [at pp.] 203–204.) However, in

fashioning an appropriate visitation order the juvenile court must recognize that any factor that may be considered, even to a 'limited' extent, can become decisive (the 'tipping factor') in some instances in determining whether visitation will occur, otherwise it is not truly a factor at all." (*In re S.H., supra,* 111 Cal.App.4th at p. 319.)

*Application to This Case*

The question here boils down to whether the juvenile court effectively delegated the determination *whether* visitation could occur to the discretion of the program. Appellant maintains he did not request that the court limit the program's ability to administer the timing, location or length of visits—only that the court must set a *minimum* number of visits (appellant would argue that the minimum is at least two per month), absent some reason relating to him particularly and not solely to program policy. Respondent characterizes appellant's claim as challenging the court's delegation of the determination of the frequency of visitation, not the determination of whether there should be visitation.

**Due process claim.** To the extent appellant is seeking to have us decide that visitation of one time per month is insufficient to comport with due process, while twice per month visitation would suffice, he raises a substantive due process claim that we are unwilling to address. Doubtless, at some point reduction of visitation to a level that actually *denies* the right or renders it illusory, would constitute a denial of substantive due process, absent a case-specific compelling reason to so limit visitation. In this case, however, appellant has not asserted any specific detriment he has suffered or any particular detriment to his relationship with his father from the program's limiting his visits with his father to once a month. Appellant cites to no case in either the dependency or delinquency context, and we have found none, holding that limiting visitation to once a month constitutes a denial of due process (or, for that matter, an abuse of discretion) absent an unlawful delegation of the power to determine visitation. We turn to the unlawful delegation issue.

**Unlawful delegation claim.** The record contains no written order regarding visitation other than one order for a family visit when appellant was confined at juvenile hall. The case plan prepared by the probation department for the May 2006 hearing contains a checked box identifying, as among the probation officer's responsibilities "[m]onthly visits with the minor's parent(s) or guardian(s)." Having never made a specific written order regarding visitation, the court's subsequent orders continuing prior orders in effect did not serve to set minimum visitation. Given the absence of a written order setting minimum visitation and the court's express deference to program policies regarding the frequency of visitation, it would be possible to construe this case as

one in which the court conferred absolute discretion on the program to determine visitation. However, review of the two status review hearings presents a more complex picture.

*Order of June 23, 2006.* At the initial status review hearing held May 26 and June 23, 2006, the court inquired about the reasons for the program's limitation of visitation, reviewed the program's response, and concluded that it was not going to alter the program's process. In so ruling, the court recognized that the program had reasons for limiting visitation and observed that the program was providing visitation "and they are prepared to provide more when the time is right." Some of the reasons given by the program appear to be general ones, apparently inapplicable to appellant, such as concerns about visitation with victimized family members and unsupervised visits by parents or guardians who may have molested the minor. However, other reasons do appear to relate to appellant—that he was in the process of settling into the program, and had been disruptive and was having difficulty settling into the program's structure. Also, as the report and the program response related, appellant had recently begun disclosing previously unknown victims and it was not known whether others might also be disclosed. The program response stated that "at this point in his program, he is considered very high risk." Because appellant has difficulty in opening up and talking about issues, the program was proceeding with caution.

The court questioned counsel as to exactly what visitation appellant was seeking. Appellant asked the court to set a minimum number of visits at two per month. The court was clear that "right now there is one visit a month." Although the court did not formally set visitation at once per month, it appears that the court and the parties understood that visitation *was* required, that one visit per month was the minimum visitation, and that more would be forthcoming as appellant progressed through the program. Moreover, the court did not merely defer absolutely to the program, but identified reasons relating to appellant that it believed supported the once-a-month visitation limit in light of the program's justifications for its policies. Specifically, the court stated that appellant's disclosure of two new victims supported the program's policy to proceed cautiously with visits at the outset. The court agreed "that the program is proceeding appropriately, and so I'll leave it [visitation] where it is."

The delegation of visitation at this point appears somewhat analogous to that at issue in *In re Chantal S., supra,* 13 Cal.4th 196, which has been characterized as permitting delegation of the decision when to *begin* visitation. (See *In re S.H., supra,* 111 Cal.App.4th at p. 319.) There, the California Supreme Court rejected a father's argument that the court had improperly delegated judicial authority to two therapists in its order specifying that

visitation was to be " 'facilitated' " by the child's therapist, and that it begin when father's therapist determined father had made " 'satisfactory progress.' " (*In re Chantal S.*, at p. 213.) The court viewed the order as giving the child's therapist no discretion, but directing that the therapist cooperate with the court's order that visitation occur upon certain conditions being met. Thus, it was not an unlawful delegation of judicial power. The court acknowledged that the order vested some discretion in the father's therapist to determine when " 'satisfactory progress' " had been made. However, because in the circumstances the court could have denied father visitation entirely, the less restrictive order specifying that visitation could begin when the therapist determined the father had made adequate progress did not unlawfully delegate judicial authority. (*Id.* at pp. 213–214.) In the alternative, *In re Chantal S.* held the order did not prejudice father, as the facts justified denying visitation altogether. (*Id.* at p. 214.)

Here, of course, there is no evidence that would support the complete denial of visitation. Moreover, as the court observed in *In re Donnovan J.*, *supra*, 58 Cal.App.4th 1474, the juvenile court's "delegation to a private therapist, as in this case, raises additional concerns. Unlike a child protective services agency, a private therapist is not statutorily bound to 'act as a cooperative arm of the juvenile court.' (*In re Chantal S.*[, *supra*,] 13 Cal.4th [at p.] 213.) A private therapist is not accountable to the court in the same manner as a child protective services agency." (*In re Donnovan J.*, at p. 1476.)

■ "Although the court upheld the order in *Chantal S.*, it implicitly recognized that an order may be improper for delegating judicial authority to a private therapist. This is consistent with findings of improper delegations of judicial authority to private individuals in other contexts, and with the prohibition in the California Constitution against delegation of duties other than subordinate judicial duties. (See Cal. Const., art. VI, § 22; *De Guere v. Universal City Studios, Inc.* (1997) 56 Cal.App.4th 482, 496 [65 Cal.Rptr.2d 438] ['The California Constitution, article VI, section 22, prohibits the delegation of judicial power except for the performance of subordinate judicial duties.']; *In re Edgar M.* (1975) 14 Cal.3d 727, 735 [122 Cal.Rptr. 574, 537 P.2d 406] [without judicial review, referee's finding juvenile ward of the court would constitute unlawful delegation].)" (*In re Donnovan J.*, *supra*, 58 Cal.App.4th at p. 1477.) The Court of Appeal in *In re Donnovan J.* found the order before it significantly different from that reviewed in *In re Chantal S.* The order stated that the father had no visitation rights without the permission of the children's therapists and consequently "neither requires that the therapists manage visitation ordered by the court, nor sets criteria (such as satisfactory progress) to inform the therapists when visitation is appropriate. Instead it conditions visitation on the children's therapists' sole discretion." (*In re Donnovan J.*, at p. 1477.) Because under the order the therapists had

unlimited discretion to decide whether visitation was appropriate, it constituted an improper delegation of judicial power. (*Id.* at pp. 1477–1478.) "Although a court may base its determination of the appropriateness of visitation on input from therapists, it is the court's duty to make the actual determination." (*Id.* at p. 1478.) The appellate court refused to speculate that the juvenile court intended to allow visitation upon father's progress or that of the children. Because the order was "open to numerous interpretations," it did not provide the therapists the necessary guidelines. (*Ibid.*) The court therefore reversed the order and remanded to allow the juvenile court to exercise its discretion in determining the conditions of visitation. (*Ibid.*)

We are persuaded that the juvenile court here did not unlawfully delegate its power over visitation by refusing to set minimum visitation at the June 23, 2006 hearing. Although we are troubled by the absence of *any* order regarding visitation, in the circumstances, it does not appear the court delegated to the program the determination of whether to allow visitation. As we have observed, the court and all the parties apparently understood that one visit per month was the minimum permitted; the program and the court had articulated reasons relating to appellant for setting the frequency at one time per month; and it was understood by all and specified by the court that more frequent visitation would be allowed once appellant settled into the program and finished the victim disclosure step. Although close to the line, we cannot determine that the court unlawfully delegated its power over visitation at this stage.

***Order from the permanency planning hearing of October 17, 2006.*** At the permanency planning hearing, held October 17, 2006, the report prepared by the probation department related that appellant had made progress since the last report. His attitude and behavior had improved, he had begun to participate more in therapy, he was more committed to treatment than previously and was doing well academically. Furthermore, the program believed appellant had "completed the necessary steps of disclosure, identification of contributing factors, and exploration of distortions in thinking that allowed him to act out sexually." Despite this improvement, appellant's visitation with his father was still limited to once a month.

At the permanency planning hearing, counsel once again sought to have visitation increased. Counsel argued, among other things, that section 727.3, subdivision (a)(3), required the court to "specify the nature and frequency of visiting arrangements with the parents or legal guardians" at the permanency planning stage. However, the statutory requirement is less clear about the timing of the requirement than counsel's characterization indicates. Section 727.3, subdivision (a)(3), mandates that "[t]he court *order placing the minor in a permanent placement* shall include a specification of the nature and

frequency of visiting arrangements with the parents or legal guardians." (§ 727.3, subd. (a)(3), italics added.) The trial court did not place appellant in a permanent placement at the permanency planning hearing of October 17, 2006. Rather, it ordered that the permanent plan remain "return home," and found the projected or likely date for finalizing the permanent plan or achieving the permanent living arrangement was December 22, 2007. Had the court placed appellant in a permanent placement at that time, it would have been statutorily required to specify the nature and frequency of visiting arrangements with appellant's parents, if the placement were other than return to his parents. However, the rule of court implementing the statute does not track the language of the statute. Rule 5.810(b)(4) provides in relevant part: *"The permanent plan order must include an order regarding the nature and frequency of visitation* with the parents or guardians." (Italics added.) It appears that the failure to specify the frequency of visitation with appellant's father violated the rule, if not the actual language of the statute. Moreover, both the statute and the rule indicate the importance placed upon an express order regarding visitation in the permanent placement process.

At the October 17, 2006 permanent plan hearing, the court clearly believed that more frequent visitation was warranted under the program's own explanation of the need for proceeding cautiously with visitation. The court stated its assumption that "the placement is going to start additional visitation, now that [additional disclosures had] occurred." The probation officer agreed and stated he would speak to someone "to make sure that happens or get an update as to if that will happen." Nevertheless, the court refused to specify minimum visitation, stating, "I'm not going to mandate them how many visits it is because I believe visits are considered also a privilege, and there may be interference with their point system if I do that. But I do want the visits to start happening more frequently, now that he's complied with their request." Unlike the prior status review hearing, the court did not indicate any circumstance or conduct by appellant that would support the program's once-a-month visitation limit. Indeed, the court indicated that more frequent visitation was warranted and stated it "wanted the visits to start happening more frequently." Nevertheless, the court refused to set minimum visitation because "there may be interference with their point system if I do that." In so ruling, the court completely delegated to the program all determinations regarding visitation, despite the fact that none of the reasons given by the program for limiting visits then applied to appellant and despite the court's stated understanding that more visitation would now occur.

The importance of an individualized determination of the visitation question for each minor is highlighted by the delinquency statutes requiring that the reasonable efforts determinations be based upon findings made on a case-by-case basis. Both section 727.2, subdivision (e), applicable to status review hearings prior to the first permanency planning hearing, and

section 727.3, applicable at the permanency planning hearing, require that the findings and determinations made by the court, including the "extent of the probation department's . . . reasonable efforts to safely return the minor to the minor's home" (§ 727.2, subd. (e)), shall be made on a "case-by-case basis" (§§ 727.2, subd. (e), 727.3, subd. (a)(4)). At the permanency planning review hearing, the juvenile court did not make an individualized determination based upon the application of the program's policies to this minor, but appears to have completely deferred to the program the question of visitation.

It is arguable that the court delegated to the program only the issue of the *frequency* of visitation and not the decision *whether* to allow visits. However, unlike its determination at the first status review hearing, where it expressly agreed that certain of the rationales for the program's "cautious" policy relating to visitation applied to this minor, the court refused at the permanency planning hearing to order increased visitation and did not anchor that decision in any particular finding relating to this appellant. The court simply refused to interfere with the program's point system. Nor did the court provide the program with guidelines regarding visitation. The court simply *assumed* that the program would begin to apply its *own* policies to allow more visitation.

An additional relevant consideration is that the delegation here was to a private program, rather than "to a public entity statutorily bound to act as a cooperative arm of the juvenile court." (*In re Chantal S., supra*, 13 Cal.4th at p. 213; see *In re Donnovan J., supra*, 58 Cal.App.4th at p. 1476; *In re Moriah T., supra*, 23 Cal.App.4th at pp. 1374–1376.)

■ Nor can we view the court at this hearing as providing "guidelines" for visitation. Although it assumed more visits would occur now that the program's stated conditions were met, the court did not so order. Indeed, based upon our inquiry of appellant's counsel, it appears that visits remained at one time per month through the most recent status review hearing of April 3, 2007, and to date. The juvenile court essentially delegated visitation decisions entirely to the private program. In doing so, the court unlawfully delegated its judicial power over visits in violation of the constitutional separation of powers.

## DISPOSITION

We affirm the order from the June 23, 2006 status review hearing (A114530). The order from the October 17, 2006 hearing (A115595) is reversed insofar as it finds the probation department made reasonable efforts to safely return the minor. The matter is remanded for a new hearing on the issue of visitation services and to allow the juvenile court to determine

minimum visitation with the father and to provide visitation guidelines to the program consistent with the views set forth herein.

Lambden, J., and Richman, J., concurred.