Filed 1/31/14  In re A.F. CA4/1

## NOT TO BE PUBLISHED IN OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA

| | |
|---|---|
| In re A.F., a Person Coming Under the Juvenile Court Law. | D064176 |
| SAN DIEGO COUNTY HEALTH AND HUMAN SERVICES AGENCY, | |
| Plaintiff and Respondent, | (Super. Ct. No. SJ12415) |
| v. | |
| E.F. et al., | |
| Defendants and Appellants. | |

APPEAL from a judgment of the Superior Court of San Diego County, Kenneth J. Medel, Judge.  Affirmed.

Leslie A. Barry, under appointment by the Court of Appeal, for Defendant and Appellant E.F.

Lauren K. Johnson, under appointment by the Court of Appeal, for Defendant and Appellant B.C.

Thomas E. Montgomery, County Counsel, John E. Philips, Chief Deputy County Counsel, and Lisa M. Maldonado, Deputy County Counsel, for Plaintiff and Respondent.

E.F. and B.C. (respectively, Father and Mother) are the unmarried parents of A.F., who is now four years old. The juvenile court terminated parental rights; found the exception to termination of parental rights under Welfare and Institutions Code section 366.26, subdivision (c)(1)(B)(i)[1] (the "continuing benefit exception") did not apply; and ordered adoption as A.F.'s permanent plan.

Father appeals, arguing the court issued an unlawful visitation order more than a year before the termination of parental rights; the visitation order led to the diminishment of the bond between A.F. and Father, and the diminished bond led to termination of his parental rights. We conclude Father forfeited this argument, as he did not timely challenge the visitation order.

Mother also appeals, arguing the court's findings are not supported by substantial evidence; the court considered improper factors when determining whether the continuing benefit exception applied; and the court should have chosen guardianship as A.F.'s permanent plan. We conclude substantial evidence supports the court's findings, and the court did not consider improper factors in its determination.

We affirm the judgment.

---

[1] All further statutory references are to the Welfare and Institutions Code.

2

## FACTUAL AND PROCEDURAL BACKGROUND

### A. *A.F.'s Removal*

In July 2010, the San Diego County Health and Human Services Agency (the Agency) filed a petition on A.F.'s behalf under section 300, subdivisions (b) and (g). The Agency alleged that Father hit Mother in the face, injuring her and knocking her unconscious. Police later discovered the parents smoking marijuana in A.F.'s presence and arrested them, leaving A.F. without adequate care. Police also discovered ecstasy pills under a mattress in the home. Father later acknowledged that the pills were his.

The juvenile court sustained the petition under section 300, subdivision (b), and placed A.F. in the care of B.G. (the guardian), a nonrelative extended family member who had raised Father from the age of 12. The court ordered family reunification services. The parents' plans focused on their need for domestic violence and substance abuse treatment. The court also ordered the parents to complete a parenting education program and to participate in a 12-step program.

At the 12-month review hearing on September 14, 2011, the Agency reported that the parents had not satisfactorily completed their reunification services and six additional months of services would not be in A.F.'s best interests. The parents had not "involved themselves in all aspects of their case plan, and [had], at best, made marginal progress on the services they [had] engaged in." Moreover, the Agency reported the parents had both used narcotics again; Mother had not participated in domestic violence treatment; and Father remained in denial of his domestic violence issues. The Agency concluded that returning A.F. to the parents would pose a grave risk to her safety and recommended

3

termination of parental rights and setting a hearing to select and implement a permanency plan under section 366.26. The court agreed, finding there was no substantial probability that A.F. would be returned to the parents within six months. The court terminated services and scheduled a permanency plan hearing.

Father petitioned this court for review of the juvenile court's order setting a permanency plan hearing. We denied Father's petition for review. (*E.F. v. Superior Court* (Jan. 6, 2012, D060543) [nonpub. opn.].)

B. *The First Permanency Plan*

On March 5, 2012, the juvenile court held a permanency plan hearing. In advance of the hearing, the Agency filed a report in which it recommended adoption as A.F.'s permanent plan. The Agency's recommendation was based on its assessment that the parents had a playmate relationship with A.F. rather than fulfilling parental roles, the parents' continuing relationship with each other, their poor judgment in lifestyle choices, and their apparent lack of insight from the services the Agency provided them.

Despite this initial recommendation, the Agency later recommended guardianship as A.F.'s permanent plan. It did so based on the request of the guardian, who asked that Father be given an additional year to regain custody of A.F. Although the guardian enjoyed caring for A.F. and was willing to adopt her, he expressed that he could not adopt her in good conscience in light of his belief Father had a strong bond with her.

At the permanency plan hearing, the court appointed B.G. as A.F.'s legal guardian, ordered that the parents have "reasonable" visitation, and terminated jurisdiction. In doing so, the court specifically found that the continuing benefit exception to termination

4

of parental rights applied to Father because he had maintained regular visitation with A.F., shared a bond with her, and A.F. would benefit from a continuing relationship with him.  The court did not make such a finding with respect to Mother.  With respect to visitation, the court ordered:  "The PARENTS is/are to have reasonable visitation with the time, place, manner, frequency, and length of visitation to be determined by the guardian(s) in the best interest of the child."  The parents did not object to this order at the time of the hearing or by way of appeal.  Between March and September, the guardian made A.F. available for visitation on a regular basis.

C. *The Guardian's Section 388 Petition*

Six months after the permanency plan hearing, the guardian stopped making A.F. available for visitation with the parents, and filed a section 388 petition to modify the court's March 2012 order.  The guardian sought another permanency plan hearing, requesting the court implement a more permanent plan for A.F.  The guardian contended the parents continued to maintain a volatile relationship, which included a new and serious domestic violence incident.  The guardian further contended A.F.'s "long[-]term care and continued stability" would be improved "without the involvement of either of the birth parents."

According to a National City Police Department crime report, Mother reported that on September 13, 2012, Father drove her to a motel room against her will, punched and bit her, and refused to let her leave once they arrived at the motel.  The police officer observed visible bruising on Mother's left arm and a "large" bite mark on the back of her right shoulder.  Father fled the scene and remained a fugitive until at least November 20,

5

2012. On that date, Father called the guardian, stating he was "still on the run from the police" and wished to see A.F. one final time before he surrendered. The guardian, concerned about Father's intentions, denied the request.

At the January 9, 2013, hearing, the court granted the section 388 petition, finding clear and convincing evidence that there was no substantial likelihood that A.F. and the parents would be unified. The court scheduled a hearing to determine a new permanent plan for A.F.[2] Neither parent challenged this order.

### D. *The Second Permanency Planning Hearing*

At the second permanency plan hearing held on July 5, 2013, the court considered evidence contained in reports the Agency submitted on February 6, May 6, and June 19, 2013; the stipulated testimony of the parents; and counsels' arguments.[3]

1. *The Agency's May 6, 2013, Report*

The Agency's May 6, 2013, report includes details of various visits between A.F. and the parents. The Agency opined that although A.F. seemed entertained when the parents visited, she relied exclusively on the guardian and his girlfriend as her parental figures and for her physical and emotional needs. A.F. did not show signs of emotion when the visits ended, at times recoiled when Mother attempted to show her affection, ignored Mother's request for help, and at times stated she wanted to go home. The social worker observed A.F. act "bossy" towards Father, make a "loud yelling sound" when

---

[2] The court reinstated jurisdiction over A.F. on December 12, 2012.

[3] The record does not contain the February 6, 2013, report.

6

Father kissed her, and easily left the visits and went home with the guardian and his girlfriend.

The Agency opined that "it [was] clear at [that] time the parent[-]child bond [did] not exist any longer" and that A.F. "view[ed] her caregiver and his girlfriend as parental figures that [met] her basic needs; provide[d] her with emotional support and love; [and were] consistent[] and stable people in her life." Although the parents had been consistent in their visits since February 2013, A.F.'s relationship with them was one of friend or playmate.

The Agency further opined the parents had not shown that they were capable of providing A.F. a stable and safe environment due in part to their unstable and, at times, violent relationship. The Agency recommended termination of parental rights and adoption as A.F.'s permanent plan.

2. *The Agency's June 19, 2013 Addendum Report*

In the June 19, 2013 addendum report, the Agency continued to recommend that the court terminate parental rights and choose adoption as A.F.'s permanent plan. The Agency also updated the court on developments since its May 6 report. At Father's request, the social worker arranged for a visit with A.F. on May 21, 2013. The guardian transported A.F. to the Agency's office for the visit but, Father did not arrive because, according to Mother, he was incarcerated again.

Mother had four visits with A.F. from May 14 to June 4, 2013, but missed visits on May 7 and June 11. According to the social worker, the visitation center monitor reported the visits were generally positive. However, during the visits on May 14 and

7

May 28, A.F. noticed Mother's fingers were bandaged and asked what had happened; Mother told A.F. her nail had fallen off. The Agency submitted screenshots of Mother's social media posts that described her being "high" on "herb" and having her fingernail torn, stating: "This is what happens to stupid drunk people."

The Agency again reported that although the parents visited A.F. on a regular basis, she parted with no emotional reaction when the visits ended. A.F. viewed the guardian and his girlfriend as her parental figures and looked to them to provide for her physical and emotional needs. A.F. viewed Mother and Father only as close relatives. The parents also continued making poor life choices, continued to have a relationship with each other, and had not addressed the domestic violence issues in their relationship. Although the parents loved A.F., they were not capable of parenting her. The Agency opined the relationship between A.F. and the parents did not outweigh the benefits A.F. would gain from adoption.

3. *The Parents' Stipulated Written Testimony*

By way of stipulated written testimony, Father testified he did not agree with the adoption plan for A.F. because he had "such a great bond" with her. A.F. knew who he was and called him "daddy." He testified she told him about her school and that she loved the shoes Mother had given her, and stated she wanted to go to his house. Father also testified A.F. often asked him about his family members. He testified he wished he could have had more time with A.F., but the guardian limited his visits and did not allow Father to care for her while the guardian was at work. Father stated A.F. missed him and cried for him.

In Mother's stipulated written testimony, Mother stated she also did not agree with the Agency's recommendation of adoption as A.F.'s permanent plan because she had a bond with A.F. that should not be severed. She testified A.F. called her "mommy." Mother testified she always brought A.F. food at visits, and A.F. asked Mother for help opening the food. Mother claimed she also provided A.F. with clothes, shoes, a backpack, and toys. During visits, she and A.F. read together and practiced counting. According to Mother, A.F. loved her because she always asked to go home with her.

4. *The Court's Rulings*

After considering the evidence contained in the Agency's reports, the stipulated testimony of the parents, and counsels' arguments, the court found by clear and convincing evidence that A.F. was likely to be adopted if the court terminated parental rights. The court found A.F. would no longer benefit from a continuing relationship with either parent, and the continuing benefit exception that previously applied to Father no longer applied. The court then terminated parental rights, chose adoption as A.F.'s permanent plan, designated the guardian as A.F.'s prospective adoptive parent, and referred the matter to the Agency for adoption services.

DISCUSSION

I. *Father's Appeal*

Father concedes substantial evidence supports the court's July 2013 finding that A.F. was adoptable and further concedes the court did not err when it found the continuing benefit exception did not apply to him as of the second permanency plan hearing. Instead, Father maintains his relationship with A.F. deteriorated because of the

9

visitation order the court issued at the first permanency plan hearing in March 2012. Specifically, he contends the trial court erred when it delegated all of its power over visitation to the guardian, who in turn unilaterally cut off visitation in late 2012 when Father was evading arrest. The Agency contends Father forfeited this argument because he did not challenge the visitation order.

As an initial matter, we agree the juvenile court erred when it relinquished all control over visitation to the guardian and at the very least should have set the frequency and duration of the visits. (*In re Rebecca S.* (2010) 181 Cal.App.4th 1310, 1314; *In re James R.* (2007) 153 Cal.App.4th 413, 436; *In re M.R.* (2005) 132 Cal.App.4th 269, 274; *In re S.H.* (2003) 111 Cal.App.4th 310, 319.) However, neither Father nor Mother challenged the court's visitation order in a timely manner despite the court's express admonition that they may do so. Father now contends the eventual breakdown of his bond with A.F. was the result of a visitation order he never challenged. However, both parents sat on their rights both during the proper time to challenge the visitation order and when the guardian changed visitation in late 2012.

The visitation order Father challenges issued in March 2012, and the time to challenge that order has long passed. One purpose for such deadlines is to address correctable errors in a timely manner so the impact of the error has limited or no reverberations in the case as it progresses. This is particularly true in dependency matters where the terms of visitation may influence a young child's relationship with a parent and eventually lead to inevitable results at hearings in the future. Accordingly, we conclude Father forfeited this issue because he did not raise it before the trial court or otherwise

10

challenge the visitation order. (*Kevin R. v. Superior Court* (2010) 191 Cal.App.4th 676, 686; *In re Sheena K.* (2007) 40 Cal.4th 875, 880-881.)

In any event, even if Father had not forfeited this issue, the trial court's error was harmless. Father contends the court's error allowed the guardian to unilaterally terminate visitation and caused the diminishment of the father-child bond he shared with A.F. However, this argument ignores Father's own role in the cessation of visitation. The record clearly shows the guardian allowed Father to see A.F. on a regular basis until Father's own conduct caused a change in the status quo. Following the domestic violence incident in September 2012, the guardian ended Father's visitation to protect A.F. from Father's objectively erratic and unsafe behavior and filed the section 388 petition. Faced with Father's behavior, we have no doubt that to protect A.F., Father's visitation rights would have been seriously curtailed by the court. In short, it was Father's conduct and fugitive status which effectively changed his visitation with his child, not the court's order delegating visitation authority to the guardian.

## II. *Mother's Appeal*

Mother contends the court erred when it found that the continuing benefit exception did not apply to her. She further asserts the court applied incorrect criteria to this determination and should have chosen guardianship as A.F.'s permanent plan. We conclude the court did not apply impermissible criteria, and substantial evidence supports its findings.

At a permanency plan hearing, the court may order one of three alternatives: adoption, guardianship, or long-term foster care. (*In re S.B.* (2008) 164 Cal.App.4th 289,

11

296-297.) If a child is adoptable, there is a strong preference for adoption over the alternative permanency plans. (*Id.* at p. 297; *San Diego County Dept. of Social Services v. Superior Court* (1996) 13 Cal.4th 882, 888.) Once the court determines that a child is likely to be adopted, the burden shifts to the parent to show that termination of parental rights would be detrimental to the child under one of the exceptions listed in section 366.26, subdivision (c)(1). (*In re Lorenzo C.* (1997) 54 Cal.App.4th 1330, 1343-1345.)

Section 366.26, subdivision (c)(1)(B)(i) provides an exception to termination of parental rights when "[t]he parents have maintained regular visitation and contact with the child and the child would benefit from continuing the relationship." In order to overcome the statutory preference for adoption, the parent must prove that he or she occupies a parental role in the child's life, resulting in a significant, positive emotional attachment of the child to the parent. (*In re Derek W.* (1999) 73 Cal.App.4th 823, 827; *In re Elizabeth M.* (1997) 52 Cal.App.4th 318, 324.)

In the context of section 366.26, subdivision (c)(1)(B)(i), " 'benefit' " means that the parent-child relationship "promotes the well-being of the child to such a degree as to outweigh the well-being the child would gain in a permanent home with new, adoptive parents." (*In re Autumn H.* (1994) 27 Cal.App.4th 567, 575.) "If severing the natural parent[-]child relationship would deprive the child of a substantial, positive emotional attachment such that the child would be greatly harmed, the preference for adoption is overcome and the natural parent's rights are not terminated." (*Ibid.*)

To review Mother's substantial evidence challenge, we view the evidence in the manner most favorable to the prevailing party and indulge in all legitimate and

12

reasonable inferences to uphold the court's ruling. (*In re S.B.*, *supra*, 164 Cal.App.4th at pp. 297-298; *In re Misako R.* (1991) 2 Cal.App.4th 538, 545.) We do not reweigh the evidence, evaluate the credibility of witnesses or resolve evidentiary conflicts. (*In re Autumn H.*, *supra*, 27 Cal.App.4th at p. 576.)

Here, Mother bears the burden to show her bond is strong enough to confer more than "some benefit" to the child to overcome the strong preference for adoption at the permanency plan hearing. (*In re Angel B.* (2002) 97 Cal.App.4th 454, 466.) Mother has not shown her relationship with A.F. rose to a level that outweighs the benefits of adoption. Although the record shows that Mother maintained regular visitation with A.F., the record supports that A.F. did not have a significant, positive emotional attachment to Mother and that A.F. would not be harmed by termination of parental rights. Although A.F. seemed entertained when Mother visited, A.F. did not show affection to Mother, recoiled and resisted Mother's affection, did not react emotionally when Mother left, and seemed more excited to see Father. At best, Mother is A.F.'s friendly visitor or extended family member. Mother has not shown she had the type of substantial emotional attachment with A.F. such that termination of parental rights would be detrimental to A.F. Thus, although A.F. would continue to glean *some* benefit from her relationship with Mother, substantial evidence supports the trial court's determination that the well-being A.F. would gain from permanent placement in the guardian's home far

13

outweighed any benefit from a continued relationship with Mother. The court did not err in finding that the continuing benefit exception did not apply to Mother.[4]

Mother also argues the trial court considered "impermissible factors" when it found the continuing benefit exception did not apply. Specifically, she objects to the court's consideration of the caregiver "stepp[ing] up" to care for A.F., the caregiver's bond with A.F., and the caregiver's permanent presence and status as A.F.'s parental figure. We are not persuaded. The court discussed these points in the context of the parents' lack of any parental bond with A.F., and the comments ultimately weighed on whether A.F. would suffer detriment if the court terminated parental rights. This is a proper factor for the court to consider when determining whether the continuing benefit exception applies.

Mother further contends the court should not have considered "the necessity of a child to have a structured home environment with predictable routines." However, this consideration simply reflects the underlying purpose of permanency plan hearings: to provide a stable, permanent placement for a child. Viewed in this context, the court considered nothing more than the very purpose of such hearings. The court was not barred from discussing or considering this fundamental purpose, and we find no error in its reasoning.

---

4     Our conclusion here forecloses Mother's final contention that the court "should have chosen a permanent plan of guardianship or long-term foster care" rather than terminate parental rights based on the "relationship [A.F.] had with [M]other."

DISPOSITION

The judgment is affirmed.


HALLER, J.

WE CONCUR:


NARES, Acting P. J.


McDONALD, J.