Filed 8/15/14  In re Michael S. CA1/2

## NOT TO BE PUBLISHED IN OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b). This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## FIRST APPELLATE DISTRICT

## DIVISION TWO

| | |
|---|---|
| In re MICHAEL S., a Person Coming Under the Juvenile Court Law. | |
| THE PEOPLE,<br><br>        Plaintiff and Respondent,<br><br>v.<br><br>MICHAEL S.,<br><br>        Defendant and Appellant. | A139406<br><br>(Contra Costa County<br>Super. Ct. No. J1201213) |

After Michael S. admitted violations of juvenile probation, the juvenile court ordered out of home placement.  On appeal from that dispositional order, appellant contends reversal is required because the notices of probation violation were facially defective, the court did not conduct an evidentiary hearing before finding the alleged probation violations true, the social study was inadequate and the court lacked sufficient information to make an informed decision on disposition, the court erroneously incarcerated him due to dissatisfaction with his parents' conduct, the court improperly removed him from his family absent a compelling basis, and he received ineffective assistance of counsel.  We affirm.

1

# STATEMENT OF THE CASE

On August 7, 2012, a petition was filed in Alameda County alleging that appellant, then 14 years of age, came within the provisions of Welfare and Institutions Code[1] section 602 in that he had committed one count of reckless driving while fleeing a police officer (Veh. Code, § 2800.2) and one count of assaulting a police officer with a vehicle (Pen. Code, § 245, subd. (a)(1)). At the detention hearing on August 8, appellant waived his right to trial and admitted the first count; the second count was dismissed. The case was transferred to Contra Costa County, where appellant lived, for disposition.

On September 4, appellant was adjudged a ward of the court and released him to his mother, with 90 days home supervision and electronic monitoring.

On March 25, 2013, the probation department filed a notice of probation violation hearing (§ 777), alleging that appellant had violated the terms of the September 4, 2012 order in that he had failed to attend school from February 25 through March 15, 2013, on March 15 he had been suspended for five days for chronic truancy, and he had been on the campus of a middle school without permission, harassing students, on several occasions. At a hearing on April 3, appellant waived his right to trial and admitted that he failed to attend school from February 25 through March 14, 2013, and that he was suspended for five days for chronic truancy; the remaining allegation was stricken. The court sustained the probation violation. Appellant was placed on home supervision with electronic monitoring for 120 days. The court gave the probation department authority to reduce this period to 60 days if appellant had no violations, but ordered the department to arrest him for any violation of probation with "no latitude."

On May 8, the probation department filed another notice of probation violation hearing, alleging that appellant had violated provisions of the September 4, 2012 and April 3, 2013 court orders in that he failed to attend school from April 22 through May 1,

---

[1] Further statutory references will be to the Welfare and Institutions Code unless otherwise specified.

2013, and, according to his monitoring device, traveled to Salida, California, on May 1, 2013, without prior permission of the probation department.

On June 10, the department filed another notice of probation violation alleging that appellant violated the conditions of the April 3, 2013 order placing him on home supervision in that on May 23 he "allowed the battery of his ankle monitoring device to die," his last known location—Oakland—had not been authorized by probation, and probation had been unable contact him. The court issued a warrant for appellant's arrest.

On June 12, appellant appeared in court and admitted the May 8 probation violation, amended to state that he "failed to attend certain periods" rather than that he failed to attend school. Appellant also admitted the June 10 violation. The court sustained the probation violations. Appellant was detained at Juvenile Hall pending disposition.

A contested dispositional hearing was held on July 15 and July 23, at the conclusion of which the court ordered that appellant be placed out of home, in a "court approved home or institution."

Appellant filed a timely notice of appeal on August 1, 2013.

### STATEMENT OF FACTS

The incident underlying appellant's initial wardship petition occurred on August 5, 2012. As described in the probation report, California Highway Patrol (CHP) officers were at the scene of a collision on 1-80 when a silver sports utility vehicle drove through the accident scene, almost striking the officers and other emergency personnel. It was discovered that the San Pablo Police were pursuing the vehicle and requested CHP take over the pursuit. A CHP officer caught up to the vehicle on I-580 and activated his red light and siren, but the vehicle continued at speeds exceeding 100 miles per hour. The pursuit continued on the highway and city streets until the driver, later identified as appellant, turned down a dead end street in Richmond. Appellant entered a driveway to turn around, officers blocked the vehicle, and appellant rammed the rear of the vehicle into the patrol car, then turned right and collided with the same patrol car. Appellant

3

attempted to evade officers by driving through a wood fence and then a metal fence, but ultimately was blocked by another patrol vehicle and a large shipping container. Appellant and his passenger refused to exit the car and appellant put it into reverse, then the officer deployed a "K-9" and appellant finally surrendered.

When interviewed by the probation officer, appellant said he had a good relationship with his parents but had not spoken with his father since the offense and believed his father was angry with him. He stated that his friends were "good kids," athletes not associated with gangs, and that he had no friends on probation. He denied using alcohol or illicit substances. On the night of the offense, appellant said, he was at home bored and decided to take his father's vehicle without permission. He had only been out for 10 minutes when the police initiated a traffic stop, and he was scared and wanted to get away. He "felt stupid" when he was apprehended and felt he had disappointed his parents.

Appellant stated, and his mother confirmed, that he did not have a history of serious medical or mental health issues and his overall health was very good. He was taking prescription medications for Attention Deficit Hyperactivity Disorder (ADHD). Appellant was entering eighth grade in the fall. School records showed he was a special education student with an Individualized Education Plan (IEP), had problems with truancy, had been referred to the Principal's office for discipline on "numerous" occasions and had been suspended "on more than one instance for fighting, defiance, and refusing to serve detention."

Appellant's mother was a registered drug offender on probation; a criminal record check indicated she had convictions for being under the influence of a controlled substance, petty theft, disturbing the peace, possession of drug paraphernalia, prostitution, possession of a bad check, possession of syringes, forging the name on a credit card, battery, receiving stolen property, conspiracy, possessing a controlled substance, and driving under the influence. Appellant's father had no documented criminal history. The family had "numerous" referrals for general neglect of appellant

4

that were "mostly unsubstantiated," and a substantiated allegation of general neglect in November 2000 that led to a family maintenance program, with the situation "stabilized" in February 2002.

The probation department assessed appellant as being at moderate risk for reoffense. He was screened for commitment to the Orin Allen Youth Rehabilitation Facility and found inappropriate for a six-month regular program because he was taking medication for ADHD. Although he was "technically eligible" for out of home placement, the probation officer stated it was premature to remove him from the home without first attempting a period of home supervision.

On March 8, 2013, the principal of the Juan Crespi Middle School informed the principal of De Anza High School that appellant had been on the middle school campus without permission approximately three or four times, harassing students. The probation officer was later informed of this report, and also told that appellant had not attended school from February 25 to March 15. About noon on March 15, the high school resource officer and probation officer went to appellant's home and found him there with a 12-year-old girl and a 13-year-old boy. Appellant was taken back to school and suspended for truancy. At an interview on March 18, appellant agreed to improve his behavior because he did not want to be detained. His father said he was unaware of appellant's behavior and thought he was at school.

On March 29, a police officer informed probation that the parents of the girl who had been at appellant's house on March 15 reported that she had run away with appellant and were seeking a restraining order against him. Appellant had not been at school since he was allowed to return on March 25.

According to the probation report, appellant lived with his father, a full time heating, ventilation and air conditioning mechanic. The father said appellant's mother had " 'walked out' on them" about a month before and her whereabouts were unknown. Appellant continued to "show a complete lack of respect for probation and the courts." His school attendance had been "more consistent, but still not perfect" during his 90 days

5

of home supervision, but he had been truant since that period ended. Appellant was "now influencing younger juveniles and has a 12-year-old girlfriend who is now cutting school herself." Despite his agreement at the probation interview to improve his behavior, he was still doing "what he wishes, as evident by his recent runaway status with the 12-year-old female and continued truancy after his suspension."

The probation report stated that appellant's father appeared unable to properly supervise him during daytime hours, as he had been unaware of appellant's behavior and was not able to assure appellant would be at school. Appellant had tested clean for all substances on March 18 but admitted frequent alcohol use. The report stated that appellant "appears to be personally unmotivated and a threat to his peers in the community." Because community resources had not yet been exhausted, the probation department recommended that appellant be placed on home supervision for 30 days and ordered to complete an outpatient drug/alcohol treatment program.

At the hearing on April 3, the prosecutor expressed concern about appellant's continued truancy and his relationship with the 12-year-old girl. Appellant's mother, through her attorney, told the court that the truancy was due in part to appellant finding his school work very challenging and feeling embarrassed about his inability to do well in school. After a colloquy with the mother about the school situation, the court and probation officer explained that if appellant's needs were not being met, the mother would have to contact the school principal to arrange a meeting about appellant's IEP, and she agreed to do so. The court encouraged the mother to use the probation officer as a resource if she had any problem with the school, and explained to appellant that the school needed to help him with a suitable program, but he needed to attend school to take advantage of it. The court ordered the probation department to file a report in 30 days detailing appellant's school attendance and general compliance with probation. Emphasizing the seriousness of having a sexual relationship with a 12-year-old girl, the court advised appellant that probation was being ordered to arrest him for any violation of

6

probation, with no opportunity for additional chances: "You have no latitude to mess up here. None. Zero."

In a report filed on May 8, the probation department stated that appellant's attendance at school had not been satisfactory from April 22 until May 1 and, on April 10, appellant had thrown a microphone at another student after being hit with a pencil. On April 30, the probation officer was informed by the high school resource officer that appellant was on campus, visibly upset and acting hostile. Appellant told the police he and his father had engaged in a physical altercation the preceding evening in which his father hit him in the back of the head; he was still upset about the altercation, his body shaking uncontrollably, and he began punching his father's truck as his father picked him up from school. The police transported appellant to Martinez Psychiatric Hospital on a section 5150 hold.

On May 2, reviewing appellant's GPS position, the probation department noticed that he had left Martinez about 4:00 a.m., gone to Richmond briefly, and ended up in the area of "Modesto/Salida" about 6:30 a.m. Neither appellant nor his father had notified probation of this travel. Probation sent a message to appellant's ankle monitoring device to call his probation officer and about one hour later, appellant's mother called and informed probation she had picked appellant up from the hospital and driven him to Richmond and then to his maternal grandmother's home in Modesto. The mother said she was living at the grandmother's home, brought appellant there because he now had a "bad relationship" with his father, and she was going to take appellant back to the father's home later in the day, after they both " 'cooled off.' "

On May 3, at a meeting with the probation officer at school, appellant said his mother had taken him back to his father's home about 6:00 p.m. on May 2. He and his father argued again and appellant did not want to stay; his mother drove him to various relatives' homes in Oakland and Vallejo until past midnight; and after being " 'turned down' " by all the relatives, they returned to the father's home for the remainder of the night. In a conference call with the probation officer, the father denied there had been a

7

physical altercation on April 29 but said appellant had become destructive that evening, breaking the front door and punching a hole through a wall. The father was willing to have appellant live with him.

The probation report stated that appellant had consistently tested clean since being adjudged a ward but on March 18 had informed the probation officer that he had been in a car with others who were smoking marijuana and had admitted frequent use of alcohol.

The probation officer stated that it was "not clear what the best living situation is for the minor." Appellant had been screened for out of home placement on April 1 and was deemed inappropriate, but "circumstances appear[ed] to have now changed. Based upon his mother's extensive criminal background history, unstable residency and history of drug use, she does not appear appropriate to house the minor. Furthermore, no other local family members appear willing to house the minor and if it is determined that the father's house is not safe, removal [from] the home may be imminent. The minor's case has also been referred to the new Juvenile Behavioral Health Collaborative for screening."

On May 23, the battery for appellant's ankle monitoring device died. His last known location was Oakland. The probation department had not authorized him to go to Oakland and subsequently was unable to locate him.

In the report filed on June 26, 2013, for the dispositional hearing, the probation officer stated that things had "escalated" since the May 8 report, as indicated by the May 23 probation violation. Appellant had appeared in court on June 12 and been detained pending disposition. On June 17, appellant told the probation officer, " 'I have been fucking up,' " admitted making poor decisions without fear of consequences, and said he now understood he would be faced with consequences. Appellant said he continued to have a poor relationship with his father and his mother had recently overdosed on crack cocaine and heroin; she had been living in Modesto but had moved back home as she tried to rehabilitate herself. The report stated, "Probation has attempted to contact the minor's family, but no calls have been returned at this time." Based on appellant's

8

"ongoing poor behavior, current home life issues, and having no other family members who appear willing to house him," appellant was screened for out of home placement and found acceptable. As previously reported, however, he was not eligible for commitment to the Orin Allen Youth Rehabilitation Facility due to his prescribed medication. He had been found inappropriate for the Juvenile Behavioral Health Collaborative Program. The probation officer stated that a "term of placement will allow the minor to address his mental health needs while providing him much needed stability which he lacks at home" and recommended that appellant be "ordered into placement as all community resources have been exhausted."

At the dispositional hearing, Artris Wiseman, who had been appellant's probation officer since October 2012, testified that placement was being recommended to address three key issues: Appellant's mental health needs, the lack of stability at his father's home, and the absence of other family members willing to house him. Wiseman was unsure whether appellant had mental health needs aside from his ADHD and did not know whether the hospitalization following the April 30 incident had resulted in additional medication being prescribed. Appellant had told Wiseman that his mother was recovering from a heroin overdose and that his father abused alcohol and worked from 8:00 a.m. to 5:00 p.m. daily, leaving appellant to go to school and "do the things on his own." Wiseman had not followed up to verify the information about the mother's overdose or the father's alcohol abuse. Appellant said that his mother had returned to the family home while trying to rehabilitate herself, but Wiseman had not spoken with the family to determine where she was currently living. Wiseman did not know how appellant's relationship with his father was. In preparing his report for the most recent violation, Wiseman had called appellant's father and left one or possibly two messages, but did not receive a return call.

The probation department had set up counseling for appellant at his high school, and Wiseman thought the parents were also involved, but he did not have any reports

9

from the counselor or know how long the counseling lasted. Asked if it seemed like appellant needed more counseling, Wiseman stated, "he needs something."

The probation department had not referred the parents for parenting classes or family counseling. Wiseman had visited appellant's home twice, on the first occasion finding no one at home and on the second finding appellant at home during the school day with two younger juveniles. Wiseman's information about the lack of relatives willing to provide a home for appellant came from appellant and his mother; he had not followed up or contacted any of the relatives. He did not know why appellant had been found inappropriate for the Juvenile Behavior Health Collaborative Program, stating, "I just screen them and they gave me the answer." Asked whether he had explained the rules of home supervision to appellant and his father, Wiseman stated, "I don't know if I did. But when he's hooked up with home supervision, the folks that do that sit down and they have to sign off and everything, the contract of home supervision."

Appellant's mother testified that when appellant was leaving the hospital after the April 30 incident, he did not want to go to his father's house and someone at the hospital called her to pick him up. She did, and drove him to her mother's house, where she had been staying because her mother was very ill. She had been trying to find the phone number to call Wiseman, then appellant's monitor alerted them to call, they found the number and she called. Asked if she had taken appellant to Oakland on May 23, she testified that she had taken him one day to her nephew's house in Oakland and thought this was the day. She testified that they went to Oakland after appellant went to school. She thought appellant had talked to his probation officer about going to Oakland but was not sure.[2]

Appellant's mother described making several attempts to help appellant with his ADHD, saying the two medications he had tried did not work, they had tried a couple of

---

[2] In appellant's mother's words, "I asked him does your probation officer know you're going here. [¶] And he's like, um. [¶] I'm not sure if he said yes or—I'm not really sure. But the way it sounded like he had talked to him."

counseling programs, and she did not know where to get extensive counseling for him. If the court ordered counseling, she would be able to take appellant and would be willing to attend if the probation officer thought this would help. She had been hospitalized from May 25 until July 3 due to a blood infection, was then in a skilled nursing center until July 7, and at the time of the hearing was living half the time with her mother and half with appellant and the father.

Appellant's father testified that his regular work schedule was 7:00 a.m. to 3:30 p.m. He sometimes travelled for work and when he did, appellant's mother would stay at the house with appellant. The father described his relationship with appellant as very good, without problems or disputes. He wanted appellant to live with him, and his only concern was that appellant did not do very well in school. He denied abusing alcohol, testifying that he had a drink or two, two or three evenings a week. The night of the altercation in which appellant said his father hit him in the head, the father was angry because he had come home from work to find "a bunch of people in the house" and the house "all torn up" with holes in the walls, and he believed appellant was lying to him about who had done the damage. He acknowledged that appellant had been "clenched over the head with the open palm"—saying his palm was directed at appellant's chest or shoulder but appellant ducked—but did not think it could have caused injury.

Appellant's father was not aware appellant had had any counseling at school and did not see how he could have received much because he "wasn't at school 90 percent of the time." If the court ordered counseling for appellant outside of school hours, his father would be able to take him and would be willing to participate in counseling. Appellant's father said he took appellant to school but appellant did not stay there. For the last four or five months of school, he got a call from the school every evening so he would know what was happening. He did not attempt to call the probation officer during this time.

Both appellant's parents testified that they had met the probation officer only once and he had never directed them to things that might help appellant.

11

## DISCUSSION

### I.

Appellant contends the May 8 and June 10 notices of probation violation were facially defective in that they did not identify which probation conditions the alleged conduct violated, and did not identify the evidence to be relied upon in proving the violations. Section 777 provides that an order changing or modifying a previous order by removing a minor from the physical custody of a parent may be made only after a noticed hearing. Where the minor has been declared a ward of the court under section 602, a notice may be filed by the probation officer or the prosecuting attorney alleging "a violation of a condition of probation not amounting to a crime" and must "contain a concise statement of facts sufficient to support this conclusion." (§ 777, subd. (a)(2).) As a matter of due process, a probationer is entitled to "written notice of the claimed violations of his probation; disclosure of the evidence against him; an opportunity to be heard in person and to present witnesses and documentary evidence; a neutral hearing body; and a written statement by the factfinder as to the evidence relied on and the reasons for revoking probation. [Citation.]" (*Black v. Romano* (1985) 471 U.S. 606, 611-612.) "Juvenile court proceedings are controlled by the same concerns and rules as adult criminal proceedings with respect to the due process right to notice of specific charges or factual allegations. (*In re Robert G.* (1982) 31 Cal.3d 437, 441-443.)" (*In re Alberto S.* (1991) 226 Cal.App.3d 1459, 1464.) The section 777 notice must identify the specific probation violation the minor is alleged to have committed. (*In re Babak S.* (1993) 18 Cal.App.4th 1077, 1086).

The May 8 notice alleged as follows: "Said minor was adjudged a Ward of the Court on 9/4/12, with Conditions of Probation which ordered him to attend school regularly, obey school authorities. Further, on 4/3/13, minor was placed on Home Supervision for 120 days. [¶] The minor violated the provisions of said order by the following act or omissions: on 4/22/13 through 5/1/13, said minor failed to attend

12

De Anza High School.  In addition, per his GPS monitoring device, said minor traveled to the area of Salida, CA on 5/1/13, without prior permission from Probation."

The June 10 notice alleged:  "Said minor was continued a Ward of the Court on 4/3/13, with Conditions of Probation which ordered him to be placed on GPS Home Supervision for 120 days.  [¶]  The minor violated the provisions of said order by the following act or omissions:  on May 23, 2013, the minor allowed the battery of his ankle monitoring device to die.  His last location was in Oakland, CA, which was not authorized by Probation.  At this time, Probation is unable to contact the minor—his whereabouts are unknown."

Appellant acknowledges the sufficiency of the May 8 allegation that he violated probation by missing school.  He contends, however, that the allegation concerning his travel to Salida was deficient because there was no allegation that the terms of probation required him to obtain permission from the probation department before such travel. Similarly, he contends the June 10 notice was deficient because it did not allege that any conditions of probation required him to maintain the life of his monitoring device battery, obtain permission from the probation department before going to Oakland or follow any particular procedures to ensure the probation department would be able to find and contact him at all times.

Appellant did not challenge the sufficiency of the section 777 notice in the juvenile court and cannot do so for the first time on appeal.  (*In re Brian K.* (2002) 103 Cal.App.4th 39, 42.)  " '[A]s a general rule, 'the failure to object to errors committed at trial relieves the reviewing court of the obligation to consider those errors on appeal." (Fischer et al., Appeals and Writs in Criminal Cases (2d ed. 2000) § 1D.26, pp. 182-183; see also 4 Cal.Jur.3d (1998) Appellate Review, § 175, pp. 233-234.)  This applies to claims based on statutory violations, as well as claims based on violations of fundamental constitutional rights.  [Citations.]  [¶]  The reasons for the rule are these:  " 'In the hurry of the trial many things may be, and are, overlooked which would readily have been rectified had attention been called to them.  The law casts upon the party the duty of

13

looking after his legal rights and of calling the judge's attention to any infringement of them. If any other rule were to obtain, the party would in most cases be careful to be silent as to his objections until it would be too late to obviate them, and the result would be that few judgments would stand the test of an appeal.' " [Citation.]' (*In re Seaton* (2004) 34 Cal.4th 193, 198.)" (*People v. McKinnon* (2011) 52 Cal.4th 610, 638.) " '[W]here a defendant fails to object at trial to the adequacy of the notice he receives, any such objection is deemed waived. [Citation.]' (*People v. Carrasco* (2006) 137 Cal.App.4th 1050, 1056; accord, *People v. Seaton* [(2001)] 26 Cal.4th [598,] 641.)" (*People v. Carroll* (2007) 158 Cal.App.4th 503, 511.)

Appellant attempts to avoid this conclusion by arguing that the forfeiture rule is inapplicable because the question whether the probation violation notices were defective presents a pure question of law, or, alternatively, that his attorney rendered ineffective assistance of counsel by failing to object. Even if the claim were properly before us, however, appellant would not prevail.

When appellant was initially declared a ward and placed on home supervision, the court ordered conditions of probation, including, as relevant here: "Obey all laws, parent/guardians," "[a]ttend school regularly & obey school authorities," "[r]eport to [probation officer] as directed & follow his/her orders," "be at legal residence between the hours of 6:00 p.m. and 6:00 a.m. unless accompanied by a parent or guardian," "not to be on school campus unless enrolled or given permission by school." These conditions were continued in force at subsequent hearings. Additionally, when appellant was placed on home supervision, he became subject to conditions imposed under that program. A minor released on home supervision, as well as his or her parent, is required to "sign a written promise that he or she understands and will observe the specific conditions of home supervision release." (§ 628.1.)

The violations appellant contends were insufficiently alleged in the probation notices were that he went to Salida without prior permission from the probation department, that he allowed his electronic monitor battery to die, that he went to Oakland

14

without prior permission, and that he left the probation department unable to contact him. These actions were alleged as violations of home supervision, which was itself a condition of probation. Appellant's contention appears to be that in addition to alleging that he violated probation by engaging in specified conduct that violated the requirements of home supervision, the notices had to expressly describe the specific conditions of the home supervision contract his conduct was alleged to violate.

Appellant has not suggested that the home supervision contract in fact did not require him to obtain permission before travelling to Oakland or Salida, or to maintain his ankle monitor in working order. His admission of the probation violations indicates that he knew it did. The probation violation notices left no question what appellant needed for his defense: Proof that the home supervision contract did not contain the requirement of advance permission for the stated travel would have negated the alleged travel violation, as proof that the requirements of electronic monitoring had not been explained to appellant would have negated the battery allegation. Appellant cites *In re Sheena K.* (2007) 40 Cal.4th 875, 890-892, in support of the proposition that he could not be presumed to know what his probation officer prohibited or required absent proof he was actually so informed. *Sheena K.* involved a probation condition that prohibited association with "anyone disapproved of by probation" without requiring that the minor know a given person was so disapproved; the condition was unconstitutionally vague because it did not inform the minor what conduct was prohibited. Here, by contrast, the notices described specific conduct and stated that this conduct violated the home supervision that was a condition of appellant's probation. The allegations were sufficiently precise to give appellant notice of exactly what he needed to defend against.

**II.**

Appellant next contends the dispositional order must be reversed because the juvenile court did not conduct an evidentiary hearing on the probation violations. Section 777, subdivision (c), provides that "[t]he facts alleged in the notice shall be established by a preponderance of the evidence at a hearing to change, modify, or set aside a previous

15

order." Contrasting this provision with subdivision (b) of section 657, which provides that a minor alleged to come within the provisions of section 602 or 601 "may, with the consent of counsel, admit in court the allegations of the petition and waive the jurisdictional hearing," appellant maintains that a minor may not admit the allegations of a section 777 petition and waive an evidentiary hearing. He relies upon the proposition that the Legislature's choice to use certain language in one statute and not include the same language in a related statute indicates the Legislature "knew how to produce a particular result, but elected not to do so in the second instance." (*In re C.H.* (2011) 53 Cal.4th 94, 106-107 ["When the Legislature uses different words or phrasing in contemporaneously enacted statutory provisions, a strong inference arises that a different meaning was intended."].) He further urges that the "discrepancy" between sections 657 and 777 is not surprising because proceedings under section 777 "require[] compliance with a different set of statutory and judicial standards than an original dispositional order." (*In re Willie T.* (1977) 71 Cal.App.3d 345, 354 (*Willie T.*).)

This quoted statement in *Willie T.* does not cast any light on the question of waiver of evidentiary hearings on section 777 petitions. In that case, the juvenile court declared the minor a ward of the court and released him to his mother's custody for a period longer than was statutorily authorized before disposition, then at a "continued" disposition hearing, removed him from his mother's custody. (*Willie T.*, *supra*, 71 Cal.App.3d at p. 353.) *Willie T.* held that the court had effectively placed the minor on probation, so that the subsequent change in disposition had to follow the procedural requirements of section 777—notice and the then-applicable requirement of proof that the "previous disposition has not been effective in the rehabilitation or protection of the minor." (*Willie T.*, at p. 353.)[3] Neither *Willie T.* nor the cases it cited deal in any way

---

[3] This language was removed from the statute in 2000 by Proposition 21 (the Gang Violence and Juvenile Crime Prevention Act of 1998, § 27, effective March 8, 2000); since then, section 777 instead has required proof that the minor has violated "an

16

with the manner of establishing the conduct underlying an initial wardship disposition or a subsequent change in disposition.[4]

Appellant is correct that different standards apply to probation violation hearings under section 777 than to hearings on initial section 602 petitions. But the procedural requirements are stricter for the latter than the former. For example, proof of the criminal conduct underlying a section 602 petition must be established beyond a reasonable doubt, while proof of a probation violation need only be demonstrated by a preponderance of the evidence. (*John L. v. Superior Court* (2004) 33 Cal.4th 158, 165.) Reliable hearsay may be used in section 777 proceedings to the extent it would be admissible in adult probation revocation proceedings. (*John L.,* at p. 165.) It would make little sense to require an evidentiary hearing only in the instance where procedural requirements are otherwise more lax that is not required where they are otherwise more stringent.

Appellant's argument that the procedural distinction between initial dispositional hearings and section 777 hearings is especially sharp since the amendment of section 777 by Proposition 21 in fact undermines the conclusion he would like us to reach. *John L.* explained, concerning the intended scope of the amended statute: "The statute's purpose,

---

order of the court" (§ 777, subd. (a)(1)) or "a condition of probation not amounting to a crime." (§ 777, subd. (a)(2).)

[4] Like *Willie T.*, the cases it cited were decided at a time when the standards governing section 777 proceedings differed from those currently applicable. *In re William S.* (1970) 10 Cal.App.3d 944, 950, *In re Denise C.* (1975) 45 Cal.App.3d 761, 766, and *In re Donna G.* (1970) 6 Cal.App.3d 890, 894, concerned the then-required notice and showing that the previous disposition had been ineffective. (See fn. 3, *ante.*) *In re Arthur N.* (1976) 16 Cal.3d 226, 233, held that proof at a section 777 hearing had to be beyond a reasonable doubt; that holding was superseded by the subsequent statutory changes to section 777. (*In re Eddie M.* (2003) 31 Cal.4th 480, 508 (*Eddie M.*).) *In re Neal D.* (1972) 23 Cal.App.3d 1045, 1049-1050, a dependency case, held that where the original basis for jurisdiction no longer existed, jurisdiction could be continued only upon a supplemental petition alleging facts sufficient to support an initial assumption of jurisdiction. This holding was overruled by *In re B.G.* (1974) 11 Cal.3d 679, 692. The lasting point of all these cases is simply that different standards govern initial disposition hearings and subsequent hearings to change dispositional orders.

17

as reflected in Proposition 21 ballot materials, also suggests an intent to affect the maximum number of juvenile probation violation cases as soon as possible. In general, voters expressed alarm over the recent increase in juvenile and gang-related crime, and the perceived inability of the juvenile justice system to protect the public, particularly against violent and recidivist offenders. (See *Manduley v. Superior Court* (2002) 27 Cal.4th 537, 574-579.) Regarding changes to juvenile court procedures like section 777, ballot materials emphasized the interest in reforming less serious offenders by holding them more ' "accountab[le]" 'for crimes and other misconduct. (*Eddie M.*, *supra*, 31 Cal.4th 480, 500.) Indeed, by making it easier to prove a probation violation alleged under section 777[, subdivision] (a)(2), Proposition 21 ensures that new misconduct otherwise immune from either an adult criminal prosecution or a new section 602 proceeding does not escape sanction altogether. (*Eddie M.*, . . . at pp. 500–501.) The ballot materials convey a sense of urgency in this regard. (See *id*. at p. 500; *Manduley*, . . . at pp. 575–576.)" (*John L. v. Superior Court, supra,* 33 Cal.4th at pp. 169-170.)

The most cursory review of caselaw reflects the regularity with which minors in fact admit the truth of section 777 allegations. (E.g., *In re Greg F.* (2012) 55 Cal.4th 393 401; *In re J.L.* (2008) 168 Cal.App.4th 43, 48; *In re Carlos E.* (2005) 127 Cal.App.4th 1529, 1533; *In re Johnny O.* (2003) 107 Cal.App.4th 888, 891.) The Legislature cannot have been unaware of this practice. Especially in light of the desire expressed in Proposition 21 to make juvenile probation violations easier to prove, it would defy common sense to infer that section 777 was intended to make it impossible for minors to admit probation violations and to require an evidentiary hearing even for minors prepared to take responsibility for the alleged conduct.

### III.

Appellant next contests the juvenile court's decision to order out-of-home placement, arguing that the social study was so inadequate that the court lacked sufficient information to exercise informed discretion, the court's order was based on appellant's

parents' failure to supervise him rather than on his own misconduct, and the court abused its discretion in placing him outside the family absent a compelling reason.

Section 280 requires the probation officer "to prepare . . . for a hearing as provided by Section 702, a social study of the minor, containing such matters as may be relevant to a proper disposition of the case. The social study shall include a recommendation for the disposition of the case." "The information contained in a properly prepared social study report is central to the juvenile court's dispositional decision. While there are no precise requirements outlined in the code or case law as to the contents of the social study, drawing an analogy from what the juvenile court must consider in making a disposition, the probation officer's report should address, in addition to other relevant and material evidence, the age of the minor, his social, personal and behavioral history, the circumstances and gravity of the offense committed by the minor, and the minor's 'previously delinquent history.' (§ 725.5.) The social study should also include 'an exploration of and recommendation to the wide range of alternative facilities potentially available to rehabilitate the minor.' (*In re Devin J*. (1984) 155 Cal.App.3d 1096, 1100.) Implicit in this requirement appears to be some insight into the minor's problems in order for the probation officer to make a recommendation with rehabilitation in mind. (See § 202[.])" (*In re L.S.* (1990) 220 Cal.App.3d 1100, 1104-1105.)

Appellant argues the social study reflected neither the "diligent investigation" nor the "thoroughness in collection and analysis of facts" that the requirement of a written report should ensure. (*In re L.S., supra,* 220 Cal.App.3d at p. 1106) He points to the probation officer's lack of knowledge about his mental health status or the reasons he had been found inappropriate for the programs for which he was screened; the probation officer's failure to independently investigate his mother's alleged overdose, his father's alleged alcohol abuse or the absence of relatives willing to accept him; and the absence from the report of analysis of or insight into appellant's problems and what placement would best meet his needs.

19

The report prepared by the probation department for the dispositional hearing described the offense underlying the wardship and the events upon which the May 8 and June 10 probation violations were based. The report then related appellant's statements to the probation officer that he made poor decisions, his home life was difficult, he continued to have a poor relationship with his father, his mother had recently overdosed on crack cocaine and heroin, and his mother had returned to live with the family as she tried to rehabilitate herself. The probation officer stated that he had attempted to contact the family but his calls had not been returned, that appellant had been found acceptable for out of home placement but was not eligible for commitment to the Orin Allen Rehabilitation Facility and that appellant had been found inappropriate for the Juvenile Behavioral Health Collaborative Program. The probation officer concluded, "A term of placement will allow the minor to address his mental health needs while providing him much needed stability which he lacks at home. Therefore the probation department respectfully recommends the minor be ordered into placement as all community resources have been exhausted."

Appellant's criticisms of the report are not inaccurate. Although the events that led to one of appellant's probation violations involved him being hospitalized for psychiatric reasons, the report contained no information about appellant's mental health status or needs. Wiseman acknowledged at the dispositional hearing that he did not know whether appellant had mental health issues other than his ADHD or whether any medication had been prescribed as a result of the hospitalization. Wiseman also acknowledged at the dispositional hearing that his source of information about appellant's situation was appellant himself. The probation officer never investigated to confirm appellant's report of his father's hours away from home for work (which differed from his father's report at the hearing), his assessment of his relationship with his father as poor (which also differed from his father's description at the hearing), what he described as his mother's overdose (but his mother described as a blood infection) and his father's alcohol abuse (which the father denied) or the unavailability of relatives willing

20

to take appellant into their homes. And while Wiseman reported that appellant had been found unsuitable for two named programs, he made no reference to any other potential program or placement that had been or could have been considered.

The case plan prepared by the probation department, however, provided an assessment of appellant's and his family's needs and the necessary elements for an appropriate placement. The assessment section of the case plan identified the needs of appellant and his family as alcohol/substance abuse counseling, appropriate parenting, development of appropriate peer relationships, employment, improved behavior at home, improved community behavior, independent living skills, mental health involvement, stable residence, and tutoring/assistance with school. Another section, assessing appellant's needs, added to the above 24-hour supervision, completion of court ordered programs, development of appropriate decision making skills, family and individual counseling, mental health referral, on-going medical and dental appointments, "[p]ublic school, alternative program," and victim awareness/restitution. The case plan indicated that an appropriate placement would include family counseling, group/individual counseling, a nurturing environment, an on-grounds school, a structured setting and substance abuse treatment.

In sum, the report focused upon the need for placement due to appellant's on-going failure to abide by the conditions of probation and home supervision and the absence of support at home for altering his behavior. Although the probation officer had not investigated appellant's mental health status, he made clear that there were mental health issues that required attention and that both individual and family counseling were necessary. The case study's assessment of the necessary elements for an appropriate placement addressed these needs, as well as appellant's need for substance abuse treatment and supervision he was not getting at home.

Without question, the report could and should have been far more thorough. Nevertheless, the court had sufficient information to make a reasoned decision on disposition. In addition to the report, the court heard the testimony of Wiseman and

21

appellant's parents. Of greatest significance, appellants' parents' testimony confirmed that appellant simply was not receiving adequate supervision at home. Appellant's father was aware of appellant's truancy but had not been able to change it, and did not acknowledge any difficulty in his relationship with his son. Appellant's mother appeared to leave it to appellant to obtain required approvals from his probation officer, as indicated in her testimony that on the occasion when she took him to Oakland, she thought he had talked to the probation officer but was not sure. When she took him to the central valley upon his release from Martinez Hospital, she did not inform the probation officer until after the officer sent a message to appellant's monitor directing him to contact probation. Her testimony that she had been trying to find the telephone number to contact the probation officer before he sent the alert but having difficulty doing so only underscores the absence of communication between them, as she was apparently unaware even how to reach him. In addition, the court was familiar with the case from prior reports and hearings, at which it had both warned appellant about the consequences of continued violations and discussed appellant's educational needs with his mother.

As appellant points out, the juvenile court made clear at the dispositional hearing that its main concern was appellant's parents' failure to supervise him. The court explained its decision to place appellant out of home as follows: "I do not think there is sufficient supervision of the minor. I'm not necessarily laying blame at anybody's feet. There are a lot of mitigating circumstances here. The health concerns that the mother has. The mother's—mother's health conditions, the father's work schedule. But there's an awful lot of presuming and assuming and not working with probation. And I'm not willing to roll dice on whether or not, after this demonstrated failure, that the minor should not be placed in placement. I think that he needs placement."

Appellant overstates the case, however, in arguing that he was placed in a restrictive setting "due to *his parents'* failure on probation" and "without regard to his own fault." Clearly, *appellant* repeatedly violated probation by habitually failing to attend school and by violating the conditions of his home supervision program. The

court's focus was not a matter of punishing appellant for his parents' conduct but of determining whether appellant could succeed on further probation in his parents' home in light of their deficient supervision during appellant's probation and home supervision.

Perhaps the most troubling aspect of this case is the delay in finding an actual placement for appellant. As indicated above, at the time of the dispositional hearing, appellant had been found inappropriate for the two specific programs mentioned by the probation officer, and the court ordered him detained in juvenile hall pending placement in an appropriate facility. Contrary to appellant's characterization, however, he was not simply placed in juvenile hall indefinitely. Rather, he was placed in juvenile hall *temporarily*, and the court set the case for hearing two weeks later, pursuant to section 737.[5] This aspect of the case—the necessity that appellant spend a period of time in juvenile hall—is unfortunate. But having determined that out of home placement was necessary, it appears the court did what it could in ordering the probation department to secure an appropriate placement, including the elements noted above that were required to meet appellant's identified needs.[6]

Appellant's contention that the juvenile court may not order out of home placement absent a compelling reason is based on case law recognizing the importance of, and constitutional protection for, familial relationships. (E.g., *Lehr v. Robertson* (1983) 463 U.S. 248, 261 [" '[the] importance of the familial relationship, to the individuals involved and to the society, stems from the emotional attachments that derive from the intimacy of daily association' "]; *In re James R.* (2007) 153 Cal.App.4th 413, 428-429 ["The United States Supreme Court has repeatedly recognized that the 'Due

---

[5] Section 737, subdivision (a), authorizes detention of a minor in juvenile hall after disposition, "until the execution of the order of commitment or of other disposition." (See § 850 [reference to "detention homes for juveniles" deemed to refer to juvenile hall].) If the minor is detained more than 15 days, the court must review the case at least every 15 days to determine whether the delay is reasonable. (§ 737, subd. (b).)

[6] According to the recent representation of appellant's attorney, he is currently placed at the Rite of Passage Program in Calaveras County.

Process Clause of the Fourteenth Amendment protects the fundamental right of parents to make decisions concerning the care, custody, and control of their children.' (*Troxel v. Granville* (2000) 530 U.S. 57, 66.)"].) Appellant notes *Moore v. City of East Cleveland* (1977) 431 U.S. 494, 506, which found unconstitutional a municipal ordinance prohibiting a grandmother from living with two grandsons who were cousins rather than brothers. *Moore* stated that "when the government intrudes on choices concerning family living arrangements, this Court must examine carefully the importance of the governmental interests advanced and the extent to which they are served by the challenged regulation." (*Id.* at p. 499.) Appellant also notes our statement in *In re James R.* that interference with the parent and child relationship " 'should only be justified by some compelling necessity.' " (*In re James R.*, at p. 429.)

Aside from reiterating the fundamental importance of familial relationships, a point beyond question, the cases appellant relies upon are not helpful. *Moore*, as we have said, involved a municipal ordinance that precluded relatives from living together unless they fell within the particular relationships approved by the city. *In re James R.* involved limitations on family visitation for a ward in an out of home placement. Here, the issue is the juvenile court's authority to order out of home placement for a minor who has been adjudged a ward of the court due to admitted criminal conduct in accordance with the provisions of the juvenile court law.

Section 202, subdivision (a), provides that the purpose of the Juvenile Court Law "is to provide for the protection and safety of the public and each minor under the jurisdiction of the juvenile court and to preserve and strengthen the minor's family ties whenever possible, removing the minor from the custody of his or her parents only when necessary for his or her welfare or for the safety and protection of the public. If removal of a minor is determined by the juvenile court to be necessary, reunification of the minor with his or her family shall be a primary objective. If the minor is removed from his or her own family, it is the purpose of this chapter to secure for the minor custody, care, and

24

discipline as nearly as possible equivalent to that which should have been given by his or her parents. This chapter shall be liberally construed to carry out these purposes."

Subdivision (b) of section 202 specifies that "[m]inors under the jurisdiction of the juvenile court as a consequence of delinquent conduct shall, in conformity with the interests of public safety and protection, receive care, treatment, and guidance that is consistent with their best interest, that holds them accountable for their behavior, and that is appropriate for their circumstances. This guidance may include punishment that is consistent with the rehabilitative objectives of this chapter. If a minor has been removed from the custody of his or her parents, family preservation and family reunification are appropriate goals for the juvenile court to consider when determining the disposition of a minor under the jurisdiction of the juvenile court as a consequence of delinquent conduct when those goals are consistent with his or her best interests and the best interests of the public. When the minor is no longer a ward of the juvenile court, the guidance he or she received should enable him or her to be a law-abiding and productive member of his or her family and the community."

Under section 726, subdivision (a), "no ward . . . shall be taken from the physical custody of a parent or guardian, unless upon the hearing the court finds one of the following facts: [¶] (1) That the parent or guardian is incapable of providing or has failed or neglected to provide proper maintenance, training, and education for the minor. [¶] (2) That the minor has been tried on probation while in custody and has failed to reform. [¶] (3) That the welfare of the minor requires that custody be taken from the minor's parent or guardian."

These provisions demonstrate that the Juvenile Court Law is designed to rehabilitate offending minors and protect society while at the same time preserving and fostering family relationships. In appellant's case, the law worked as it was supposed to. Appellant was adjudged a ward of the court based upon his commission of an offense that posed significant risk to others. He was placed on probation and home supervision after the initial imposition of wardship and again after violating the conditions of probation.

25

When he continued to violate probation, and his parents' failed to supervise him sufficiently to address the continuing problems, the court found him in need of placement outside the home. We find neither an abuse of the court's discretion nor an unconstitutional infringement of his family's right to live together.

## IV.

Finally, appellant contends he was denied effective assistance of counsel. He argues counsel was ineffective in three respects: arguing for him to remain at home with support services from the Behavioral Health Collaborative Program when the probation department had reported that he had been screened and found inappropriate for that program; failing to retain an expert to evaluate his psychological state and needs; and advising him to admit the probation violations without first investigating whether they could be proven or whether appellant had been informed of the conditions he was alleged to have violated.

"In assessing claims of ineffective assistance of trial counsel, we consider whether counsel's representation fell below an objective standard of reasonableness under prevailing professional norms and whether the defendant suffered prejudice to a reasonable probability, that is, a probability sufficient to undermine confidence in the outcome. (*Strickland v. Washington* (1984) 466 U.S. 668, 694; *People v. Ledesma* (1987) 43 Cal.3d 171, 217.) A reviewing court will indulge in a presumption that counsel's performance fell within the wide range of professional competence and that counsel's actions and inactions can be explained as a matter of sound trial strategy." (*People v. Carter* (2003) 30 Cal.4th 1166, 1211.) Appellant bears the burden of establishing constitutionally inadequate assistance of counsel. (*Ibid.*; *Strickland*, at p. 687.) "If the record on appeal sheds no light on why counsel acted or failed to act in the manner challenged, an appellate claim of ineffective assistance of counsel must be rejected unless counsel was asked for an explanation and failed to provide one, or there simply could be no satisfactory explanation." (*Carter*, at p. 1211.)

26

Appellant urges that if the prosecution had been put to its proof, expert psychological evidence concerning his condition and needs had been elicited and a "well-tailored plan of rehabilitation" had been proposed and advocated, "a disposition more favorable to the minor could have been obtained." He does not suggest, however, what deficiencies there might have been in proof of the violations (other than to suggest he might not have been aware of the conditions of probation and home supervision, a suggestion hard to square with his necessarily having had to sign a home supervision agreement), or what a psychological evaluation might have shown that would have altered the court's view of the case. The focus of the disposition hearing, as we have said, was on the lack of supervision at home. However misguided appellant's attorney's continued reference to the Behavioral Health Collaborative Program might have been once it was reported that appellant had been found inappropriate for the program, the court's concern was that *any* program requiring appellant's voluntary cooperation would be insufficient. As the court commented, "Well, if he's required to go to school and knows that he is and doesn't show up, why should I assume that he's going to go voluntarily to counseling sessions set up by the Juvenile Behavioral Health Collaborative?" Nor has appellant suggested what more favorable dispositional order might have been obtained absent the deficiencies he cites. Appellant's argument that he might have obtained a more favorable disposition is based upon his portrayal of the disposition he received as "incarceration at Juvenile Hall." As we have said, this characterization is inaccurate. Juvenile hall was not the intended placement. Appellant was detained in juvenile hall temporarily, pending his placement in an appropriate facility, because the juvenile court found he needed to be removed from home. In short, appellant has not demonstrated a reasonable probability that the outcome of the proceedings would have been more favorable even if counsel had done the things appellant claims should have been done.

## DISPOSITION

The orders are affirmed.

27

_____

Kline, P.J.

We concur:

_____

Richman, J.

_____

Brick, J.*

 

* Judge of the Alameda County Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.

28